IN RE the MARRIAGE OF:

Mary Ellyn DOERR, Petitioner-Respondent-Cross
Appellant,

v.

Charles A. DOERR, Respondent-Appellant-Cross
Respondent.

Court of Appeals

*Nos. 93–0707, 93–1164. Submitted on briefs July 14,
1994.—Decided November 3, 1994.*

(Also reported in 525 N.W.2d 745.)

For the respondent-appellant-cross respondent the cause was submitted on the briefs of *Thomas M. Olson* of *The Law Center* of La Crosse.

For the petitioner-respondent-cross appellant the cause was submitted on the brief of *Ramona A. Gonzalez* of *Bosshard & Associates* of La Crosse.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J.   The parties, Charles and Mary Ellyn Doerr, raise several issues in an appeal and cross-appeal from a judgment of divorce. Charles, the appellant, claims that the trial court erred in: (1) awarding an "up-front" lump-sum payment to Mary Ellyn in lieu of maintenance; (2) ordering him to contribute to Mary Ellyn's attorney fees and to pay the fees of the guardians ad litem and an expert witness; and (3) ordering a fixed minimum child-support award based on his "potential" income. Mary Ellyn argues on her cross-appeal that the court erred in ruling that certain assets held by Charles were inherited or gifted property not subject to division in the divorce.

We conclude that it was error to award the lump-sum payment to Mary Ellyn, and we remand to the trial court to reconsider its division of the parties' property. In all other respects, we affirm the judgment.

The parties were married in 1974 and at the time of the divorce had four minor children. Mary Ellyn was forty-seven years old, with a degree in education and teaching certificates in both the public and Waldorf school systems. She worked part time during the marriage as a teacher and self-employed daycare provider, and the trial court found that she had "the ability to

earn $15,000 to $21,000 per year . . . ."[1] Charles was forty-two at the time of the divorce and had completed two years of college. During the marriage he worked as a carpenter, earning $12,000 to $13,000 a year. Charles's family, however, has supplied him with substantial gifts and inheritances over the years, some of which were used to supplement his and Mary Ellyn's income and to acquire marital property. Indeed, Charles is the sole beneficiary of two family trusts generating income of approximately $32,000 per year.[2] The trial court found that while the parties' "lifestyle choices" during the marriage resulted in their living a "frugal existence,"[3] gifts and inheritances "have allowed the family to enjoy such things as Minnesota ski trips, flying lessons for [one of the children], and private school tuition for all of the children."

---

[1] In plain violation of this court's rules, the recitation of facts in Charles's brief contains no citations to the record. We thus disregard all facts so stated and rely instead on the trial court's findings.

[2] One of the trusts, the Charles A. Doerr Revocable Trust, generates income to Charles of approximately $15,000 per year. That trust is the subject of Mary Ellyn's cross-appeal. The other trust provides Charles with additional annual income of approximately $17,000. Charles also has a remainder interest in that trust and a future interest in a third trust, and the court found his interests to have a present value in excess of $420,000. The court noted that Charles "may also inherit monies or property on the death of various relatives and may receive substantial gifts in the future," although it found it "impossible to determine . . . when or whether [he] will gain control of these assets, or how much they may be worth now or in the future."

[3] The court found, for example, that "their home lacked many of the amenities which most people of more modest means would take for granted."

The trial court issued three separate decisions in the case. The first, dated August 5, 1992, ruled that certain gifts and inheritances received by Charles during the marriage—including the two trusts—should be excluded from the marital estate and remain Charles's separate property. The court concluded that any increase in the value of the trusts during the marriage also remained Charles's separate property, reasoning that any such increase did not derive from the efforts of the parties but was the result of general economic conditions and the efforts of Charles's father. As indicated, Mary Ellyn has cross-appealed from that portion of the judgment.

Then, on January 8, 1993, the court entered findings of fact and conclusions of law dividing the marital property equally between the parties, awarding $100,000 in "lump-sum maintenance" to Mary Ellyn[4] and ordering Charles to pay child support of thirty-one percent of his "gross annual income potential," but "not less than $775 per month." The court determined Charles's potential income to be $30,000, approximately $12,500 from his work as a carpenter[5] and $17,000 representing the income from one of his trusts. The court also ordered Charles to pay $20,000 of Mary Ellyn's attorney fees and approximately $24,500 in guardian ad litem and expert witness fees.

---

[4] The trial court's supplemental conclusions of law, which we discuss below, indicate that this lump-sum payment was expected to come from the liquidation of some of Charles's nonmarital assets.

[5] The figure was derived from the income Charles earned "[i]n his last full year of employment as a carpenter." At the time of the divorce, Charles had quit working and had returned to school to pursue a degree in art, while "living off the income from gifts and inheritances."

118

Finally, on March 12, 1993, the trial court issued "supplemental and amended" conclusions of law indicating that it had, in awarding lump-sum maintenance to Mary Ellyn, "committed an error of law" by failing to fully consider the tax consequences of the award. Then, apparently believing that it would be more advantageous to make the award part of the property division, the court concluded that unless Mary Ellyn were permitted to share in a portion of Charles's separate estate, she would suffer a "hardship." It thus ordered Charles to pay her $100,000 out of his nonmarital funds as part of the property division and expressly stated that "[t]his property is awarded to Mary Ellyn in lieu of maintenance and maintenance is denied to both parties."

## I. *The Lump-Sum Payment*

While the parties' briefs contain lengthy arguments on the law of maintenance, the trial court's amended conclusions and judgment unequivocally state that the $100,000 payment to Mary Ellyn was not maintenance but rather an invasion of Charles's nonmarital property in the course of the property division. Indeed the court expressly denied maintenance to either party.

Nonmarital property may be subject to division in cases where to do otherwise would impose a "hardship" on one of the parties, and we have defined the term "hardship" as "a condition of financial privation or difficulty." *Popp v. Popp*, 146 Wis. 2d 778, 791, 792, 432 N.W.2d 600, 604, 605 (Ct. App. 1988). We allow such an invasion into a party's separate estate where "inclusion of the exempt assets [in the division] is necessary to eliminate or alleviate a financial difficulty or privation

119

which would otherwise exist if the property division were limited to the marital property." *Id.* at 793, 432 N.W.2d at 605. It is a determination resting not upon traditional considerations of equity or fair play, but solely "upon hardship principles." *Id.* at 792, 432 N.W.2d at 605.

Relying on an earlier case, *Asbeck v. Asbeck*, 116 Wis. 2d 289, 295, 342 N.W.2d 750, 753 (Ct. App. 1983), we stated in *Popp* that the determination of hardship is "a discretionary finding" which, of course, carries a deferential standard of review.[6] *Popp*, 146 Wis. 2d at 791, 432 N.W.2d at 604. We went on in *Popp*, however, to overturn the trial court's determination of hardship on grounds that the facts did not meet the definition of the term we fashioned in *Popp*. *Id.* at 792-93, 432 N.W.2d at 604-05. In so doing, we went beyond the limited review normally accorded to discretionary rulings.

We did the same in a later case, *Hughes v. Hughes*, 148 Wis. 2d 167, 173, 434 N.W.2d 813, 815 (Ct. App. 1988), this time upholding a determination of hardship, but again, only after considering whether the facts relied upon by the trial court "clearly satisfie[d] the *Popp* test for hardship."

---

[6] We discussed the limited scope of our review of discretionary rulings in *Steinbach v. Gustafson*, 177 Wis. 2d 178, 185, 502 N.W.2d 156, 159 (Ct. App. 1993), where we said:

> Generally, "[w]e will not reverse a discretionary determination by the trial court if the record shows that discretion was exercised and we can perceive a reasonable basis for the court's decision." *Prahl v. Brosamle*, 142 Wis. 2d 658, 667, 420 N.W.2d 372, 376 (Ct. App. 1987). Indeed, "[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary determinations." *Schneller v. St. Mary's Hosp.*, 155 Wis. 2d 365, 374, 455 N.W.2d 250, 254 (Ct. App. 1990), *aff'd*, 162 Wis. 2d 296, 470 N.W.2d 873 (1991).

Thus, despite our statements in *Asbeck, Popp* and *Hughes* that we review hardship determinations under standards applicable to discretionary decisions by the trial courts, it appears that in practice we have applied a different standard. It is a three-step analysis that (1) begins with a review of the factual findings underpinning the trial court's determination, (2) moves to a consideration of whether the facts properly found by the court satisfy the definition of "hardship" and (3) examines whether, in light of that hardship, the trial court appropriately exercised its discretion in invading the nonmarital property.

Each step in the process has its own standard of review. The first step addresses the trial court's findings of fact for, as we said in *Popp*, "[a] hardship determination must . . . be made in light of the facts and history of the case and the relative financial circumstances of the parties before and after the divorce." *Popp*, 146 Wis. 2d at 792, 432 N.W.2d at 605. Findings of fact are reviewable under the "clearly erroneous" standard.[7] The second step measures the properly found facts against the *Popp* definition of hardship and that task, involving as it does the application of a general proposition of law to the facts of the case, is a question of law that we review de novo, owing no deference to the trial court's determination.[8] The third and final step in the analysis is a review of the trial court's

---

[7] *See* § 805.17(2), STATS., which states that findings of fact made by a trial court shall not be set aside on appeal "unless clearly erroneous."

[8] "[W]hether the facts fulfill a particular legal standard is a question of law," *Nottelson v. DILHR*, 94 Wis. 2d 106, 116, 287 N.W.2d 763, 768 (1980), and we decide such questions de novo.

discretionary determination of whether the hardship warrants invasion of the nonmarital property under the particular circumstances of the case. That determination is, as we have noted above, subject to the deferential review that is generally accorded to discretionary rulings by the trial court.[9]

In this case, the trial court found the following facts relating to the hardship issue:

> b.   Neither party brought significant assets to the marriage.
> c.   [Charles] has significant assets which are not subject to division as part of the marital property.
> . . . .
> e.   [A]t age 47, Mary Ellyn is five years older than [Charles] and approaching a time when her chances of securing employment consistent with her level of education will begin to rapidly diminish.
> f.   The parties have agreed that [Charles] should be awarded the marital home, even though Mary Ellyn has been granted sole legal custody of

*First Nat'l Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

[9] It is a process similar to the one we employ in considering whether a trial court properly ruled on whether a modification of child support is warranted by changed circumstances. In *Peters v. Peters*, 145 Wis. 2d 490, 493-94, 427 N.W.2d 149, 151 (Ct. App. 1988), while describing the setting of support as committed to the trial court's discretion—as is, of course, the issue of property division generally—we first examined the court's factual finding that a change in circumstances occurred under the "clearly erroneous" standard, and then considered whether the court was legally correct in ruling that the change was "substantial." Because we held that the court erred as a matter of law in so concluding, we did not reach the third, discretionary step of the analysis.

the children. She therefore needs to receive suffi-
cient property from the division of the marital
assets to allow her to acquire a residence, which will
allow her and the children to live at the level they
enjoyed during the later years of the marriage.

. . . .

i.   The standard of living during the marriage
was quite unusual: they chose to live at near pov-
erty level; yet inheritances and gifts from
[Charles's] family always provided a "safety net."
From time to time these funds were used to provide
modest nonessentials at [Charles's] discretion.
Mary Ellyn accepted this lifestyle, which improved
slightly in the later years of the marriage.

j.   Their earning capacities from employment
[are] about equal, but [Charles] has substantial
unearned income . . . while Mary Ellyn has none.

On the basis of those facts, the court ruled as fol-
lows:

The court concludes that not to include some of
[Charles]'s separate, non-marital property in the
marital estate would result in a hardship to Mary
Ellyn, in that: (a) she will not be able to support
herself at the standard of living enjoyed during the
marriage; (b) the parties relied upon [Charles]'s
non-marital property to supplement and augment
their lifestyle throughout the marriage.[10]

Neither party disputes the trial court's underlying
factual findings or otherwise challenges them as
unsupported by the record. Because they are not
clearly erroneous, we turn to the legal question:

---

[10] On a point irrelevant to the hardship issue, the court also
concluded that including the nonmarital property in the marital
estate would have more beneficial tax consequences than the
"lump-sum maintenance award" made in its earlier decision.

whether the trial court erred in concluding that a hardship existed.

The sum and substance of the court's "hardship" conclusion is that, without invading Charles's nonmarital property, Mary Ellyn would have difficulty achieving the standard of living she enjoyed during the marriage—a standard that, by the parties' choice, was admittedly low.

*Popp*, however, defines "hardship" in terms of "privation," and the dictionary defines "privation" as a "lack of what is needed for existence." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 936 (1991). And while it is doubtful that any court would require a party to be in such dire straits in order to find hardship in cases such as this, the definition requires something more than an inability to continue living at the predivorce standard. In *Popp*, for example, we overturned a determination of hardship that had been based primarily on the fact that "[the wife's] standard of living would be affected and she would be deprived of the economic benefit of her years of contribution to the family unit in the form of housekeeping, consortium and child care." *Popp*, 146 Wis. 2d at 793, 432 N.W.2d at 605.

We conclude here, as we did in *Popp*, that "[w]hile the reasons noted by the trial court undoubtedly make the [court's] hardship ruling fair, they do not reveal that inclusion of the exempt assets is necessary to eliminate or alleviate a financial difficulty or privation which would otherwise exist . . . ." *Popp*, 146 Wis. 2d at 793, 432 N.W.2d at 605.[11] As we have noted, the fact that the court's decision may be fair and equitable is

[11] It is also instructive to compare the facts in this case with those in *Hughes*, where we held that the following findings *supported* the trial court's determination of hardship:

124

not the test under the *Popp/Hughes* analysis. *Id.* at 792, 432 N.W.2d at 604-05.

Because our ruling plainly frustrates the trial court's property division, we remand to the trial court to allow it to reconsider that division in light of our decision in this case.

## II. Attorney, Guardian ad Litem and Expert Witness Fees

■

Charles next argues that the trial court erred in ordering him to contribute to Mary Ellyn's attorney fees and to pay the fees of the guardians ad litem and the expert witness retained by one of the guardians. This, too, is a discretionary determination, which must be based on a showing of need by one party and the other's ability to pay. *Bussewitz v. Bussewitz*, 75 Wis. 2d 78, 89-90, 248 N.W.2d 417, 424 (1977); *Bisone v. Bisone*, 165 Wis. 2d 114, 123-24, 477 N.W.2d 59, 62 (Ct. App. 1991).

---

(1) [the court's] concern for [the wife's] comfort and convenience; (2) [the wife's] age and health problems; (3) [her] meager income, lack of education and bleak job future; (4) [the husband's] concealment and diversion of marital assets to the detriment of the marital estate; (5) [his] commingling of marital funds with [other] property to the detriment of the marital estate; (6) [his] inability to pay present or future maintenance; (7) the necessity for [the wife] to live off her property division if only marital assets were considered; and (8) [her] inability to provide herself a proper lifestyle were the inherited property not divided. This last factor particularly considers and satisfies the financial privation or difficulty test set out in *Popp*.

*Hughes v. Hughes*, 148 Wis. 2d 167, 173-74, 434 N.W.2d 813, 815-16 (Ct. App. 1988) (citation omitted). Here, of course, the parties' marital estate, which was equally divided, was minimal, as were their debts. And there were no findings of any unusual contribution to the marriage by either party.

The trial court noted that the Doerrs' divorce "generated much bitterness," and that it was a case "where substantial fees would have been incurred under the best of circumstances." According to the court, the guardian ad litem and expert witness fees were "necessarily incurred" because of the bitterness of the dispute—particularly Charles's custody contest—and while the court felt that both Mary Ellyn and Charles "share[d] some responsibility" for the difficulties encountered in the case, it found that the length of the trial and its complexity were primarily the result of Charles's insistence on litigating custody and related issues "despite very substantial evidence contrary to his position." The court noted, for example, that its final decision, after Charles's lengthy and expensive custody challenge, did not deviate substantially from the pretrial recommendation of the guardian ad litem. Nonetheless, said the court, Charles "insisted upon retaining an additional expert," which, while "add[ing] to the expense of the case for both parties, . . . provided very little evidence which was useful to the court in reaching a decision." The trial court also stated that if Mary Ellyn were required to pay her own attorney fees and to share in payment of the fees of the guardians ad litem and the expert witness, "she will be left with inadequate resources to maintain herself and the children at the standard of living enjoyed during the marriage."

As we have noted above, we will sustain a discretionary determination by the trial court if the record shows that discretion was in fact exercised and there is a reasonable basis for the court's decision. *Steinbach v. Gustafson*, 177 Wis. 2d 178, 185, 502 N.W.2d 156, 159

(Ct. App. 1993). The record establishes that that is what the court did in this case.

Charles contends that the court must have considered his nonmarital assets in ordering him to make the payments, and that this was improper. As Mary Ellyn points out, however, the statute authorizing the court to order contributions to fees, § 767.262, STATS., contains no language restricting the court's consideration of the parties' financial situations and resources. And we agree with her assessment that to restrict that consideration to marital assets alone "would allow one monied party to spend the other party into submission." The trial court did not erroneously exercise its discretion in ordering the payments.

### III. Child Support

Charles also challenges the child-support provisions of the judgment, arguing first that the trial court improperly set support based on his potential, rather than his actual, gross income and, second, that by making it a "not-less-than" award, the court improperly deviated from the mandatory child support percentage standards promulgated by the Department of Health and Social Services.

As indicated, the court ordered Charles to pay thirty-one percent[12] of his gross income, *but not less than* $775 per month, as child support. The $775 figure was based on Charles's "potential income," in light of the fact that, when he was served with the divorce papers, he quit his carpentry business and entered art school. The court calculated that potential income at

---

[12] The percentage standard for four children is thirty-one percent. WISCONSIN ADM. CODE § HSS 80.03(1)(d).

approximately $30,000 by considering Charles's earnings of $12,500 from his carpentry business in the last full year of its operation, together with the $17,000 he was receiving, and will continue to receive, from one of his trusts, and applied the thirty-one percent figure to that amount.

We first consider Charles's argument that the "fixed-amount" aspect of the support award constitutes an improper deviation from the percentage standards. Under § 767.25(1j), STATS., trial courts are to determine child support by applying the percentage standards to the payor's gross income. There is an exception, however, in cases where the court finds that application of the standard would be unfair to either the child or to any party. Section 767.25(1m). In *Lendman v. Lendman*, 157 Wis. 2d 606, 618, 460 N.W.2d 781, 786 (Ct. App. 1990), for example, we affirmed a trial court's deviation from the guidelines where the husband's income "fluctuated in relation to [his] business." We said that in such circumstances, "[u]sing a percentage standard would mean that the amount of support would change as often as his income fluctuated," and we affirmed the trial court's conclusion that "it would be in the child's best interests to have a set amount of support." *Id.*

In this case the trial court ruled as follows:

If the court orders [Charles] to pay the percentage standards, the potential for manipulation of child support payments is substantial. The current situation—[Charles] has ceased working as a carpenter and is now pursuing a college degree, while living off the income from gifts and inheritances—is the most obvious example. An order requiring that he pay a minimum amount each month, based upon

128

his gross annual income potential is therefore necessary.

■

We are satisfied that awarding a fixed minimum amount of child support in appropriate cases is within the discretion of the trial court. And while the trial court in this case did not, in contrast to the *Lendman* court, specifically find that the fixed award was "in the child[ren]'s best interests," such a determination is fairly inferred from the court's remarks. The trial court did not erroneously exercise its discretion in setting a fixed minimum award of child support.

We also reject Charles's challenge to the court's use of his "potential" income as the basis for setting support. Citing *Balaam v. Balaam*, 52 Wis. 2d 20, 187 N.W.2d 867 (1971), for the proposition that divorced fathers should be allowed to choose their means of livelihood,[13] he argues that because the court's determination was not accompanied by a finding that he was "shirking" his responsibilities to his children—that his return to school was undertaken for the express purpose of reducing the money he would have available to pay support—it was improper for the court to consider anything other than the income he actually received.

We discussed the "shirking" concept in the context of a different issue in *Kelly v. Hougham*, 178 Wis. 2d 546, 504 N.W.2d 440 (Ct. App. 1993), where it was argued that a divorced father's return to school was a

---

[13] He refers to the following passage in *Balaam*: "[a] divorced husband should be allowed a fair choice of a means of livelihood and to pursue what he honestly feels are his best opportunities even though he might for the present, at least, be working for a lesser financial return." *Balaam v. Balaam*, 52 Wis. 2d 20, 28, 187 N.W.2d 867, 871 (1971).

change in the parties' circumstances that could form the basis for a change in his child-support obligations. We said in *Kelly* that a supporting husband who decides to leave a well-paying job to pursue his education "must justify his decision in light of his obligations to his children," *id.* at 556, 504 N.W.2d at 444, and we held that because the husband's return to school was not motivated by a desire to shirk his support obligation and did not deprive the children of the support to which they were entitled, the trial court could properly determine that the parties' financial circumstances had changed so that consideration of the merits of the husband's request to lower his support was appropriate. *Id.* at 557-58, 504 N.W.2d at 444-45.

Our conclusion in *Kelly* was based on the following factors: the husband delayed returning to school until his former wife had completed law school and had secured a "well-paying job"; he continued to work part time "at a respectable wage," while attending school; and it was estimated that his schooling would substantially increase his income. *Kelly*, 178 Wis. 2d at 557-58, 504 N.W.2d at 444-45. None of those factors is present in this case. Indeed, the trial court specifically found that "[Charles's] decision to return to school at this relatively late date is not related to any desire to increase [his] future earning power," and that:

> [Charles] is a skilled carpenter and enjoys a reputation as a reliable and diligent worker . . . . However, the distraction of this divorce and the financial security provided by the gifts and inheritances he has received from his family have diminished his carpentry income. Whether he will pursue employment as a carpenter in the future is unknown. *He . . . needs incentives to maximize his*

> *earnings in order that he might contribute his fair*
> *share to the support of his children.*

(Emphasis added.)

As Mary Ellyn points out, in the years 1988 to 1990, Charles earned an average of $13,500 per year as a carpenter and, in January 1991, immediately after these proceedings were commenced, he quit his carpentry business and enrolled as a full-time student. Then, on January 17, the day after the initial temporary order hearing, he withdrew from the university and worked only minimally after that.

We agree with the language in *Balaam* and similar cases that a divorced husband should be permitted "a fair choice of a means of livelihood" in order to "pursue what he honestly feels are his best opportunities." *Balaam*, 52 Wis. 2d at 28, 187 N.W.2d at 871. As the *Balaam* court noted, however: "This rule is, of course, subject to reasonableness commensurate with his obligations to his children . . . ." *Id.* Divorce, as we have often said, " 'terminates only the relationship of husband and wife, and does not affect in any manner the parental . . . duties of the parties.' " *Sommer v. Sommer*, 108 Wis. 2d 586, 590, 323 N.W.2d 144, 146 (Ct. App. 1982) (quoting *Hutschenreuter v. Hutschenreuter,* 23 Wis. 2d 318, 321, 127 N.W.2d 47, 49 (1964)).

The trial court found that there was a "substantial" potential for Charles to manipulate his child support, and that, as a result, Charles needed an "incentive" so that he would contribute a "fair share" to his children's support. We think it was within the trial court's discretion, in light of its factual findings and all the circumstances of this case, to base its support award on the income Charles relinquished, together

with that from the trust. The court's explanation of its reasons for so ruling satisfies us that the decision was the result of a reasoned application of law to the facts and it is thus a sustainable exercise of discretion.

## IV. The Nonmarital Status of the Charles A. Doerr Trust

Mary Ellyn's cross-appeal challenges the trial court's ruling that the assets held in the Charles A. Doerr Revocable Trust are gifted or inherited property not subject to division. We glean the following facts concerning the trust from the trial court's findings.

In 1985, at his father's suggestion, Charles consolidated his assets—mostly cash and stocks he had received from his family—into an asset management trust. The trust corpus was held in a custodial account, and the bank reported to Charles. Charles's father, however, who had always managed Charles's funds, managed the new account and the trust investments. Additional gifts and inheritances of cash and stocks were added to the trust from time to time, and in 1989 Charles's father terminated the asset management trust and transferred all assets to the newly created Charles A. Doerr Revocable Trust, which he continued to manage. As the settlor, Charles could amend or terminate the trust at any time and the entire net income and principal were payable to him on demand. Over the years, disbursements from the trust, which always exceeded its income, were made to Charles, who used them to acquire marital property and pay family expenses.

The trial court ruled that while the disbursements were used for marital purposes, under applicable law the trust corpus remained Charles's separate property.

Division of a divorcing couple's property is, as we have noted above, a discretionary determination which is entitled to deference on review. *Lendman,* 157 Wis. 2d at 610-11, 460 N.W.2d at 783.

Citing § 767.255, STATS.,[14] and *Torgerson v. Torgerson,* 128 Wis. 2d 465, 468, 383 N.W.2d 506, 508 (Ct. App. 1986), Mary Ellyn argues that whether certain assets qualify as gifted or inherited property is a question of law which we decide de novo, owing no deference to the trial court's decision. In this case, however, Mary Ellyn argues not that Charles's stocks and other assets were not initially given to or inherited by him, but that the trust assets, as they now exist, cannot be *traced* to gifted or inherited property for they have been "changed" or transmuted into marital property by the commingling of nonmarital and marital assets through various trust sales and acquisitions over the years.

In *Torgerson* we expressly noted that no such "commingling" or "transmutation" claim was being made. *Torgerson,* 128 Wis. 2d at 468 n.1, 383 N.W.2d at 508. Where, as here, "commingling" is at issue—where the claim is that property has lost its nonmarital status—we employ a much narrower standard of review: "We view a tracing or commingling determination by a trial court as presenting a question of fact [which] will not be set aside unless [it is] clearly erroneous." *Brandt v. Brandt,* 145 Wis. 2d 394, 407, 427 N.W.2d 126, 130 (Ct. App. 1988).

The trial court heard testimony from both Charles and his father as to the source of the funds and the various trust transactions over the years and made its

---

[14] Section 767.255, STATS., states that gifted or inherited property is exempt from division in divorce actions.

findings and conclusions accordingly. Mary Ellyn's argument challenges the trial court's acceptance of that testimony. She claims, for example, that Charles's testimony was inconclusive on the source of some of the trust funds and that his father's testimony should not be believed because he "did not prepare any of the exhibits marked at his deposition." She asserts that some of the exhibits offered by Charles and his father did not "accurately portray" income flow in the trust and that they amounted to no more than a "fantasy portrayal of the facts as Charles wished them to be." These arguments, and others on the point put forth by Mary Ellyn, go to the weight to be accorded the evidence, and that is a matter left to the trial court, not this court, to determine. *Rucker v. DILHR,* 101 Wis. 2d 285, 290, 304 N.W.2d 169, 172-73 (Ct. App. 1981).

Charles's father testified that he had managed Charles's finances "all his life" and had personal knowledge of Charles's accounts, including the various trusts. His testimony was based on his firsthand knowledge and review of various documents, and that testimony, believed by the trial court, supports the court's determination that the trust assets are traceable to "gifts and inheritances received by Charles."[15]

Mary Ellyn also claims that the trial court erred in ruling that Charles's father had been the principal manager of the trust and that, as a result, any increase in the trust's value occurred as a result of the father's efforts and general economic considerations and thus

---

[15] As Charles notes in his brief, once he establishes a prima facie case that the property was gifted or inherited and thus exempt from division, the burden shifts to the opposing party to establish that the property was not gifted or inherited, or that it has lost its exempt status. *Brandt v. Brandt,* 145 Wis. 2d 394, 408-09, 427 N.W.2d 126, 131 (Ct. App. 1988).

remained nonmarital property. *See Wierman v. Wierman*, 130 Wis. 2d 425, 440-41, 387 N.W.2d 744, 751 (1986) (where the increase in value of separate property is due to market conditions or the efforts of a third person, the property retains its nonmarital character). She argues that the fact that dividends and other income generated by trust assets were used to purchase additional securities, and that Charles has always had access to the trust, renders the reasoning of *Wierman* and similar cases inapposite. The trial court's finding that Charles's father is the principal manager of the trust is based primarily on his testimony that he has always managed Charles's assets, and the fact that Charles also has access to the trust does not render that finding clearly erroneous. Mary Ellyn has pointed us to no evidence that the increase in value of the trust is attributable to either Charles's or her own efforts.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.