Edward KASHISHIAN, Personal Representative of the
Estate of Ruth Kashishian and WEA Insurance
Corporation, Plaintiffs-Appellants,

v.

Issam AL-BITAR, M.D., Mount Sinai Medical Center,
Wisconsin Health Care Liability Insurance Plan and
Wisconsin Patients Compensation Fund, Defendants-
Respondents.†

Court of Appeals

*No. 94–1435. Submitted on briefs April 4, 1995.—Decided
May 23, 1995.*

(Also reported in 535 N.W.2d 105.)

†Petition to review denied.

On behalf of the plaintiff-appellant Edward Kashishian, the cause was submitted on the briefs of *Sean N. Duffey* of *Schulz & Duffey, S.C.*, of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Michael P. Malone* and *Susan R. Tyndall* of *Hinshaw & Culbertson* of Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

FINE, J.   Edward Kashishian, personal representative of the estate of his sister Ruth Kashishian, appeals from a judgment, following a bench trial, dismissing medical malpractice claims against the defendants. The only issue on this appeal is whether Mount Sinai Medical Center can be held vicariously liable for Ruth Kashishian's injuries and death, allegedly caused by the negligence of Steven Port, M.D. Kashishian seeks to hold Mount Sinai liable under the following theories: that Dr. Port was Mount Sinai's apparent agent at the time of Dr. Port's alleged negligence; that Dr. Port's alleged negligence should be imputed to Issam Al-Bitar, M.D., for which Mount Sinai would be liable under the doctrine of *respondeat superior*; that Dr. Port's alleged negligence should be imputed to Mount Sinai by virtue of an asserted joint venture between Dr. Port's employer, the University of Wisconsin, and Mount Sinai.[1] We conclude that the trial court misinterpreted applicable law in holding that Dr. Port was not Mount Sinai's apparent agent. Accordingly, we reverse.[2]

---

[1] Kashishian originally sued Dr. Port, but failed to file a timely notice of claim with the State of Wisconsin, as required by § 893.82(3), STATS. *See Kashishian v. Port*, 167 Wis. 2d 24, 49–52, 481 N.W.2d 277, 287–288 (1992) (affirming Dr. Port's dismissal from the action). After the trial court's decision upon which this appeal is based, the parties stipulated that all of Kashishian's claims against the defendants would be dismissed with prejudice, "with the sole exception of those claims against the Defendants arising from their vicarious liability for the alleged negligence of Dr. Steven Port."

[2] We thus do not consider the other two theories that Kashishian raises. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

## I.

Ruth Kashishian had breast cancer. William Donegan, M.D., performed a modified mastectomy on her in 1978. In December of 1983, Dr. Donegan discovered that her cancer had returned, and, as a result of her dissatisfaction with her care at Milwaukee County's hospital, referred her to Hugh L. Davis, M.D., an oncologist on the staff of Mount Sinai. Dr. Davis was an employee of the University of Wisconsin Medical School and the Milwaukee Practice Plan, a non-profit corporation formed to administer the medical school's teaching clinic at Mount Sinai. The Milwaukee Practice Plan employed those medical-school faculty members and others who worked at Mount Sinai as part of the medical school's teaching clinic.

In early April of 1986, Ruth Kashishian told Dr. Davis that she had shortness of breath. Dr. Davis determined that there was fluid between her left lung and the lining of that lung, and, additionally, that there was fluid in the sack around her heart. Dr. Davis admitted her to Mount Sinai, as he did with almost all of his patients, and told the resident who took care of the admission details that she needed further treatment by lung and heart specialists. The admitting resident told Dr. Davis that Dr. Port was available for the cardiology evaluation and surgery, and Dr. Davis told the resident that he had no objection to Dr. Port. Although on Mt. Sinai's staff, Dr. Port was not its employee.

The operation was performed on April 4, 1986. A needle was inserted into the sack surrounding Ruth Kashishian's heart, and, ultimately, a catheter replaced the needle in order to draw off the fluid. The operation up to that point was performed by Issam Al-Bitar, M.D., a fellow in cardiology at the hospital,

726

under Dr. Port's supervision. Once the catheter was in place, however, the flow of fluid was less than it should have been and, as testified to by Dr. Al-Bitar, Dr. Port "took over." Dr. Port injected air into the sack. Less than ten minutes later, Ruth Kashishian went into respiratory arrest and lost consciousness. She died on June 18, 1986.

Dr. Port testified that the decision to inject air into the sack surrounding Ruth Kashishian's heart was his and his alone. He agreed that he did so "primarily as a teaching tool to demonstrate pericardial metastasis to Dr. Al-Bitar."[3] Edward Kashishian, as personal representative of Ruth Kashishian's estate, claims that the injection of air by Dr. Port caused her death. As noted, Kashishian seeks to hold Mount Sinai liable for Dr. Port's alleged negligence.

## II.

█

Like Dr. Davis, Dr. Port was an employee of the University of Wisconsin Medical School and of the Milwaukee Practice Plan; he was not an employee or actual agent of Mount Sinai. *Kashishian*, 167 Wis. 2d at 33–37, 481 N.W.2d at 280–281. Nevertheless, a medical-malpractice action may be maintained against a hospital for the negligence of a physician working in the hospital even though the physician is not employed by the hospital if the hospital has made it appear to the

---

[3] Dr. Al-Bitar's testimony was similar:

> When I was not able to get good flow from the catheter, [Dr. Port] took over for me and he basically injected the air. At that point, I was informed about it to tell me that [sic] — He was explaining to me how air is used as a contrast to delineate the pericardium and also to define or show the presence of metastasis in the pericardium.

patient that the physician is a hospital employee and the patient relied on that appearance. *Kashishian v. Port*, 167 Wis. 2d 24, 39–47, 481 N.W.2d 277, 282–286 (1992). ·

*Kashishian* expanded the scope of *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 423 N.W.2d 848 (1988), which held that unless the patient knows otherwise, the patient has a right to assume that those who render emergency-room services are employed by the hospital. *Id.*, 144 Wis. 2d at 207–208, 423 N.W.2d at 855–856.

> [G]enerally people who seek medical help through the emergency room facilities of modern-day hospitals are unaware of the status of the various professionals working there. Unless the patient is in some manner put on notice of the independent status, it would be natural for the patient to assume that these people are employees of the hospital.

*Id.*, 144 Wis. 2d at 210, 423 N.W.2d at 856. There thus need not be an "express representation" that the person alleged to be negligent is an employee for the doctrine of apparent authority to apply. *Id.*, 144 Wis. 2d at 209–210, 423 N.W.2d at 856. Accordingly, "except when the patient enters a hospital intending to receive care from a specific physician while in the hospital, it is the reputation of the hospital itself upon which a patient relies." *Id.*, 144 Wis. 2d at 212, 423 N.W.2d at 857.

> [T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific

physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.

*Id.*, 144 Wis. 2d at 211–212, 423 N.W.2d at 857.
■

*Kashishian* extended the rationale underlying *Pamperin* to all hospital services, *see Kashishian*, 167 Wis. 2d at 37, 481 N.W.2d at 281 (doctrine of apparent authority can apply "when a patient is admitted by her own personal attending physician and then receives services at the hospital"), and adopted *Pamperin*'s three-part test:

1) the hospital, or the individual alleged to be negligent, acted in a manner which would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; 2) where the acts of the individual alleged to be negligent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and 3) the plaintiff acted in reliance upon the conduct of the hospital or the individual alleged to be negligent, consistent with ordinary care and prudence.

*Kashishian*, 167 Wis. 2d at 44, 481 N.W.2d at 284–285; *see also Pamperin*, 144 Wis. 2d at 203, 423 N.W.2d at 854. Under this test, as applied to the hospital/physician/patient relationship, a hospital cloaks

with apparent authority an independent contractor whom it permits to use its facility when the hospital does not tell the patient that the independent contractor is not a hospital employee, and the patient does not otherwise know that the independent contractor is not employed by the hospital—even though the hospital does not expressly represent to the patient that the independent contractor is its employee. *Pamperin*, 144 Wis. 2d at 206–211, 423 N.W.2d at 855–857 ("Unless the patient is in some manner put on notice of the independent status, it would be natural for the patient to assume that these people are employees of the hospital.").[4] Furthermore, as we have already seen, "except when the patient enters a hospital intending to receive care from a specific physician while in the hospital, it is the reputation of the hospital itself upon which a patient relies." *Id.*, 144 Wis. 2d at 212, 423 N.W.2d at 857.

*Kashishian* directed the trial court in this case to determine whether Dr. Port was Mount Sinai's apparent agent in his care and treatment of Ruth Kashishian. *Id.*, 167 Wis. 2d at 49, 481 N.W.2d at 287. After a bench trial, the trial court, reading the three-part test literally, concluded that neither Mount Sinai nor Dr. Port did anything that would lead a reasonable person in Ruth Kashishian's position to believe that Dr. Port was Mount Sinai's agent or employee, and that the plaintiff did not prove that Ruth Kashishian relied on "the alleged agency relationship between Mount

---

[4] This is step one of the three-part test. If this first step is satisfied by the hospital's actions, step two is moot. Additional proof of the hospital's knowledge and acquiescence would be required only when apparent agency is proved using step two, that is through proof of the actions of the person alleged to be the apparent agent.

Sinai Medical Center and Dr. Port, consistent with ordinary care and prudence, when she consented to treatment by Dr. Port."

Whether Dr. Port was Mount Sinai's apparent agent or employee here is a legal issue. *See Doerr v. Doerr*, 189 Wis. 2d 112, 121 n.8, 525 N.W.2d 745, 749 n.8 (Ct. App. 1994) (whether facts fulfill a legal standard is. a question of law). Appellate courts usually. decide legal issues *de novo. Ibid.* Nevertheless, where, as here, the legal issues are intertwined with the underlying facts, a trial court's legal conclusions on those issues are entitled to substantial weight. *See Ballenger v. Door County*, 131 Wis. 2d 422, 427, 388 N.W.2d 624, 628 (Ct. App. 1986); *cf. Kashishian*, 167 Wis. 2d at 49, 481 N.W.2d at 287 (Whether Dr. Port was Mount Sinai's apparent agent "is one for the trier of fact."). The trial court here, however, made few findings of historical fact that were pertinent to the issue of whether Dr. Port was Mt. Sinai's apparent agent. We conclude that the trial court misapplied the law as crafted by *Pamperin* and *Kashishian*; namely, contrary to the concurrence's implication, there is no evidence here that Ruth Kashishian either was told or knew that Dr. Port was not an employee of Mt. Sinai. Thus, part one of the *Pamperin/Kashishian* test was met here as a matter of law. Further, the evidence is undisputed that Ruth Kashishian did not enter Mt. Sinai with the intent "to receive care from a specific physician." *See Pamperin*, 144 Wis. 2d at 212, 423 N.W.2d at 857. Thus, there was also "reliance" here under the *Pamperin/Kashishian* test as a matter of law.

In support of his position that Dr. Port was Mount Sinai's apparent agent, Mr. Kashishian marshals from

731

the record the following evidence: Dr. Port was on Mount Sinai's staff as director of nuclear cardiology from 1982 through 1986; Dr. Port noted on the cardiac consultation record relating to Ruth Kashishian that she was "referred to us" for evaluation; the consent form that Ruth Kashishian signed on April 3, 1986, was headed "MOUNT SINAI MEDICAL CENTER"; six advertisements that appeared in the *Milwaukee Journal* in January, February, and March of 1986, extolled Mount Sinai's benefits, and there was testimony that she received the newspaper; Ruth Kashishian was referred to Dr. Davis at Mount Sinai because she had been dissatisfied with the care she was receiving at Milwaukee County's hospital; when she was receiving chemotherapy treatments at Mount Sinai, before the April 4, 1986, operation, she would walk past a sign in the lobby that bragged about the "world class care" given by Mount Sinai; when her mother was going to have surgery at the hospital in 1984, Ruth Kashishian checked into Mount Sinai's reputation and discovered that it had, according to her brother, a "high rating"; as phrased in Mr. Kashishian's brief on this appeal, Ruth Kashishian "acquiesced to her admission to Mt. Sinai"; Dr. Port's usual practice was to introduce himself to a patient by telling the patient "I'm a cardiologist here, and I was asked — Dr. Davis asked — my doctor, whoever asked me to get involved with your care"; it was Dr. Port's practice to identify himself to patients as a member of the University of Wisconsin faculty "[o]nly if that was particularly appropriate."

In opposition to Mr. Kashishian's argument that Dr. Port was its apparent agent, Mount Sinai points out that those physicians employed by the Milwaukee Practice Plan were required to wear name tags identifying themselves as members of the University of

Wisconsin Medical School faculty, and that posted throughout Mount Sinai, at "most if not all of the clinics," were signs that informed the public that the clinics were staffed by faculty from the medical school. There is no evidence in the record, however, as to whether Dr. Port wore his special name tag during his dealings with Ruth Kashishian, or that she saw the signs. Although on the hospital's staff, Dr. Port was not its employee, and the trial court did not find that Ruth Kashishian either knew or should have known that Dr. Port was an employee of the University of Wisconsin Medical School and the Milwaukee Practice Plan rather than an employee or agent of the hospital.

None of the facts marshalled by the parties and which we have related is disputed. They show that Ruth Kashishian was admitted to Mount Sinai by Dr. Davis for cardiac consultation and treatment that was to be done by other physicians. There is no evidence in the record that Ruth Kashishian knew that Dr. Port was also an employee of the Milwaukee Practice Plan and the University of Wisconsin Medical School. Thus, the first element of the *Kashishian/Pamperin* test has been satisfied. *See Pamperin*, 144 Wis. 2d at 210, 423 N.W.2d at 856 ("Unless the patient is in some manner put on notice of the independent status, it would be natural for the patient to assume that these people are employees of the hospital."). The "reliance" element of that test has also been satisfied. Ruth Kashishian did not seek treatment for her heart condition from a specific physician. Dr. Port was one of many who were available; he was, in effect, selected for her by the admitting resident at Mount Sinai. Thus, she was "seeking care from the hospital itself." *See id.*, 144 Wis. 2d at 212, 423 N.W.2d at 857 ("[E]xcept when the patient enters a hospital intending to receive care from

a specific physician while in the hospital, it is the reputation of the hospital itself upon which a patient relies."). Accordingly, Dr. Port was Mount Sinai's apparent agent at the time of Dr. Port's alleged negligence.

*By the Court.*—Judgment reversed.

SCHUDSON, J. (*concurring*). I agree that Edward Kashishian offered substantial evidence on which the trial court could have ruled in his favor on a theory of apparent agency. I am not as certain as the majority, however, that the evidence compelled that conclusion as a matter of law.

As the majority explains, to establish apparent agency, the plaintiff in this case would have had to prove: (1) that Mt. Sinai or Dr. Port "acted in a manner which would lead a reasonable person to conclude that [Dr. Port] was an employee or agent of [Mt. Sinai]"; (2) if the proof of the first element related solely to Dr. Port's actions rather than to those of the hospital, that Mt. Sinai "had knowledge of and acquiesced in" the acts creating the appearance of authority; and (3) that Ruth Kashishian "acted in reliance upon the conduct of [Mt. Sinai] or [Dr. Port], consistent with ordinary care and prudence." *Kashishian*, 167 Wis. 2d at 44, 481 N.W.2d at 284-285. The trial court concluded that the plaintiff "failed to produce sufficient evidence" to establish the first and third elements.

The evidence in this case was mixed and somewhat uncertain. Because Ruth Kashishian died, the parties could not present all the direct evidence that otherwise would have been available. In all likelihood, such evidence would have been highly probative on the third element and, possibly, could have been probative on

the first element as well. Thus, the trial court necessarily drew inferences from the circumstantial evidence presented at trial in order to determine how Dr. Port acted and the extent to which Ms. Kashishian relied on his actions and those of Mt. Sinai. The majority acknowledges that the trial court's factual findings and legal conclusions are intertwined and are entitled to substantial weight. *See* majority op. at 731. Although the evidence could have led the trial court to a different conclusion on the issue of apparent agency, I am not convinced that the trial court misapplied the law when it concluded that the plaintiff "failed to produce sufficient evidence" to satisfy the first and third elements.

Nevertheless, I concur in the majority's result because Edward Kashishian should have prevailed on his second theory of liability: joint treatment doctrine/*respondeat superior*. Mt. Sinai, as Dr. Al-Bitar's employer, does not dispute its liability for the negligence of Dr. Port under the doctrine of *respondeat superior* if Dr. Port and Dr. Al-Bitar jointly treated Ms. Kashishian. The undisputed facts establish that they did so.

Dr. Al-Bitar performed Ms. Kashishian's surgery under Dr. Port's supervision until the point at which difficulties led to Dr. Port's intervention. The trial court concluded, however, that they were not jointly treating because "the decision to inject air into Ms. Kashishian's pericardium . . . was a decision made solely by Dr. Port" and that he "was in exclusive charge of the procedure at the time air was injected, and had responsibility for the patient at that time." Dr. Port's exclusive control at that point, however, did not alter the apparent joint treatment that he and Dr. Al-Bitar had provided throughout the operation. Thus, as a matter of law, the undisputed facts established Mt.

735

Sinai's liability because Dr. Al-Bitar and Dr. Port jointly treated Ms. Kashishian. *See Fehrman v. Smirl*, 25 Wis. 2d 645, 653-656, 131 N.W.2d 314, 318-319 (1964).