**Joseph BYNUM and Lila Bynum, Plaintiffs,**

v.

**Joana H. MAGNO, M.D.; Michael H. Dang, M.D.; John P. Callan, M.D.; The Queens Medical Center, Defendants.**

**No. CV 99–00927 DAE.**

United States District Court, D. Hawaii.

Dec. 13, 2000.

David J. Dezzani, Lisa A. Bail, Goodsill Anderson Quinn & Stifel, Honolulu, HI, for Plaintiff.

Howard F. McPheeters, Burke Sakai McPheeters Bordner, Iwanaga & Estes, William S. Hunt, Ellen Godbey Carson, Alston Hunt Floyd & Ing, George W. Playdon, Jr., Reinwald O'Connor & Playdon, Peter C.P. Char, Char Hamilton Campbell & Thom, Honolulu, HI, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

EZRA, Chief Judge.

The court heard Defendants' Motions on December 4, 2000. David J. Dezzani, Esq., Thomas Benedict, Esq., and Anne T. Horuichi, Esq., appeared at the hearing or on the briefs on behalf of Plaintiffs. Howard F. McPheeters, Esq., appeared at the hearing on behalf of Defendant Joana H. Magno, M.D.; William S. Hunt, Esq., appeared at the hearing on behalf of Defendant Michael H. Dang, M.D.; George W. Playdon, Jr., Esq., appeared at the hearing on behalf of Defendant John P. Callan, M.D.; Peter C.P. Char, Esq., appeared at the hearing on behalf of Defendant Queens Medical Center. After reviewing the Motions and the supporting and opposing memoranda, the court GRANTS IN PART AND DENIES IN PART Defendants' Motions for Summary Judgment.

## BACKGROUND

While vacationing on the Big Island on July 13, 1998, Plaintiff Joseph Bynum ("Plaintiff") suffered chest pain and difficulty breathing. He went to the emergency room at North Hawaii Community Hospital, where doctors decided he should be transferred to Queen's Medical Center in Honolulu because of the appearance of unstable angina. Plaintiff, age 79 at the time, also had a history of chronic obstructive pulmonary disease (COPD).

At Queen's, Plaintiff came under the care of Defendant Dr. Joana Magno, ("Dr.Magno"), a cardiologist. Dr. Magno performed a cardiac catheterization, a medical procedure, also known as coronary angiography, used to evaluate the condition of the arteries and which aids in determining the best course of treatment. Based on the results of this procedure, Dr. Magno recommended that Plaintiff undergo coronary artery bypass grafting (CABG) surgery. The surgery was performed by Defendant Dr. Michael Dang

("Dr.Dang"), a cardiovascular surgeon, who obtained Plaintiff's signature on an informed consent form. In addition, Dr. Magno sought the assistance of Defendant Dr. John Callan ("Dr.Callan"), a pulmonologist, because of Plaintiff's history of COPD.

A few weeks after the surgery, Plaintiff began experiencing increased respiratory difficulty. In August, Dr. Dang performed a tracheostomy. Since then, Plaintiff has been ventilator-dependant, and has resided at various chronic care facilities in Southern California. Plaintiffs (Mr. Bynum and his former wife) claim that Mr. Bynum's ventilator dependance resulted from injury to his phrenic nerve during the CABG surgery.

Plaintiff brought suit on December 30, 1999, against Drs. Magno, Dang, and Callan and the Queen's Medical Center alleging medical negligence. Plaintiff's former wife [1] also joined the suit, claiming loss of consortium and emotional distress. This court has jurisdiction over this state law cause of action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because the Plaintiffs are citizens of California, the Defendants are citizens of Hawaii, and the amount in controversy exceeds $75,000.

All Defendants now move for summary judgment. Dr. Magno filed her motion on August 25, 2000; Plaintiffs filed their opposition on November 16, 2000; Dr. Magno replied on November 22, 2000. Dr. Dang filed his motion on August 21, 2000; Plaintiffs filed their opposition on November 16, 2000; Dr. Dang replied on November 22, 2000. Dr. Callan filed his motion on August 17, 2000; Plaintiffs filed their opposition on November 16, 2000; Dr. Callan replied on November 22, 2000. Queen's Medical Center filed its motion on September 27, 2000; Plaintiffs filed their opposition on November 16, 2000; Queen's Medical Center replied on November 22, 2000.

---

1. Plaintiffs Mr. and Mrs. Bynum are presently divorced, but still bring this action together.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. 2505. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

## DISCUSSION

### I. Defendant Dr. Joana Magno's Motion for Summary Judgment

Plaintiffs' claims against Dr. Magno relate to her involvement in the CABG procedure.[2] *See* Complaint; Plaintiff Lila Bynum's Answers to Defendant Joana Magno, M.D.'s First Request for Answers to Interrogatories (April 25, 2000), p. 6 [hereinafter "Answers to Magno's Interrogatories"]. Specifically, Plaintiffs allege that Dr. Magno was negligent in recommending the CABG surgery because (1) indicators were not present that such surgery was necessary, and (2) she did not give appropriate consideration to alternatives, especially considering Plaintiff's history of COPD. Plaintiffs also allege that

---

**2.** Plaintiffs do not assert any claims related to Dr. Magno's performance of the cardiac catheterization. *See* section I.A.2 and n. 3.

Dr. Magno was negligent in obtaining Plaintiffs' informed consent for the surgery because (1) she did not provide Plaintiffs with adequate information to obtain their informed consent, (2) she obtained the informed consent under inappropriate circumstances, and (3) she obtained the consent prior to Plaintiff's evaluation by the pulmonary specialist, Dr. Callan. *See* Answers to Magno's Interrogatories.

Dr. Magno now moves for summary judgment on all these claims, under a variety of theories. The court will address each theory she raises in her Motion.

### A. Claims Based on Informed Consent

1. **The duty to obtain informed consent runs only to Joseph Bynum and not to Lila Bynum.**

 ■ Dr. Magno first argues that any claim based on lack of Mrs. Bynum's informed consent must fail as a matter of law because the duty runs only to the patient and not to the spouse. Plaintiffs respond that, according to the Agency for Health Care Policy and Research, doctors should keep the patient's family informed of the diagnosis and treatment strategies.

 The only Hawaii case specifically on point is *Nishi v. Hartwell*, which held that the duty of informed consent runs only between doctor and patient, and not between doctor and patient's family. 52 Haw. 188, 52 Haw. 296, 473 P.2d 116 (1970) *overruled on other grounds by Carr v. Strode*, 79 Hawai'i 475, 904 P.2d 489 (1995); *see also Turpie v. Southwest Cardiology Associates*, 124 N.M. 787, 955 P.2d 716 (1998) (also holding that duty does not extend beyond the patient). *But see Safer v. Estate of Pack*, 291 N.J.Super. 619, 677 A.2d 1188 (1996) (finding that duty may run to patient's family members who may be adversely affected by the breach of

duty). Based on this Hawaii rule, the court must conclude that Lila Bynum cannot sustain an informed consent claim against Dr. Magno. The Agency for Health Care Policy and Research merely provides guidelines for doctors; it does not establish a legal rule. Accordingly, Dr. Magno's Motion for Summary Judgment on this ground is GRANTED. Lila Bynum cannot recover on a theory of lack of informed consent.

2. **Claims Based on the Cardiac Catheterization**

 Dr. Magno also seeks summary judgment on any claims related to the cardiac catheterization procedure she performed. She argues that any such claims should be dismissed because Plaintiff has produced no evidence that he was injured by the procedure and because Dr. Magno properly obtained informed consent.

 Dr. Magno is apparently arguing these theories out of an abundance of caution: there is no claim in the Complaint nor in the Answers to Magno's Interrogatories that Plaintiff sustained injuries as a result of the cardiac catheterization. In their "Separate and Concise Statement of Facts" attached to the opposition to the instant motion, Plaintiffs admit that Plaintiff (Mr. Bynum) suffered no injury from the cardiac catheterization. Nowhere do Plaintiffs allege that they are seeking relief based on any negligence in connection with that procedure specifically. The Plaintiffs' opposition to the instant motion does not even address this theory. Because Plaintiffs are not challenging the cardiac catheterization procedure itself, there is no claim on which to grant or deny summary judgment.[3]

 Plaintiffs do, however, allege general negligence attributable to Dr. Magno that

---

**3.** In their "Separate and Concise Statement of Facts" in opposition to the instant motion, Plaintiffs dispute whether Dr. Magno properly explained the risks and obtained informed consent for the cardiac catheterization procedure. In the Complaint, the Answers to Magno's Interrogatories, and the Memorandum in

Opposition to the instant motion, however, Plaintiffs do not appear to bring any claims based on faulty performance of the cardiac catheterization. (Indeed they admit that no injury was suffered as a result of the cardiac catheterization). Rather, all claims stem from the CABG surgery.

is not specifically linked to her performance of the cardiac catheterization procedure. Plaintiffs claim that Dr. Magno failed to properly evaluate Plaintiff's condition and inaccurately diagnosed three-vessel coronary artery disease (i.e., inaccurately interpreted the results of the cardiac catheterization), thus leading her to improperly recommend the CABG surgery. Claims related to the CABG surgery are discussed *infra*.

### 3. Dr. Magno's duty to obtain informed consent for the CABG surgery

■ Dr. Magno next argues that, under the circumstances, she had no duty to obtain informed consent for the CABG surgery because she was the referring physician, rather than the treating physician. That is, after performing the cardiac catheterization, she referred Plaintiff to Dr. Dang who performed the CABG surgery. She argues that the recent Hawaii case *O'Neal v. Hammer*, 87 Hawai'i 183, 953 P.2d 561 (1998), supports her position.

*O'Neal* held that where a referring physician does not perform the procedure for which the patient is referred and does not retain any control over the patient's treatment, the referring physician does not have a duty to obtain informed consent. *Id.* at 565. A referring physician does have a duty to obtain informed consent, however, where he or she orders the procedure or "otherwise retains control over the patient." *Id.* The existence of the duty turns on the "degree of participation or retention of control of the referring physician." *Id.* The court also held that where the surgeon obtains informed consent, the referring physician's duty to obtain it may be discharged because the chain of causation is broken. *Id.* at 567.

*O'Neal* involved a dental malpractice case. The plaintiff saw an orthodontist, Dr. Hammer, who recommended a course of treatment that included mandibular advancement surgery. The surgery was actually performed by an oral surgeon, Dr. Berringer. The plaintiff brought negligence claims based on lack of informed consent against both (as well as against another oral surgeon from whom she obtained a second opinion). *Id.*

The Hawaii Supreme Court held that the trial court erred when it concluded, as a matter of law, that Dr. Hammer did not need to obtain the plaintiff's informed consent. Although he did not perform the surgery himself, it was part of a course of treatment prescribed by him. He himself had already initiated the first step in the treatment plan by extracting the plaintiff's bicuspids, thus necessitating completion of the process by performance of the mandibular advancement surgery. Under these circumstances, the court found that a referring doctor may be obligated to obtain informed consent. *Id.* at 566–67.

Dr. Magno now contends that, under the *O'Neal* analysis, the court must conclude that she owed no duty to Plaintiff to obtain informed consent. Unlike in *O'Neal*, Dr. Magno did not commit Plaintiff to the surgical procedure (the cardiac catheterization procedure was not a necessary predicate to the CABG surgery), did not participate in the surgery, and retained no control over his treatment after the surgery. Dr. Magno argues that she merely referred Plaintiff to Dr. Dang for surgery, and that he would make an independent assessment of Plaintiff's condition. She also argues that, even if she had such a duty, it was discharged when Dr. Dang properly obtained Plaintiff's informed consent.

Plaintiffs argue that Dr. Magno did have a duty to obtain informed consent because she and the other defendants jointly managed Plaintiff's care—she remained his attending physician throughout his stay at Queen's. *See* Queen's Medical Records at 92 (attached to Plaintiffs' Opposition as Exhibit 1); Magno Deposition at 144–45 (attached to Plaintiffs' Opposition as Exhibit 2). Moreover, they argue that the level of control retained by Dr. Magno is a question of fact for the jury to decide. They also argue that Dr. Magno assumed the duty to provide adequate informed consent because she recommended the

surgery as Plaintiff's only alternative. The recommendation, furthermore, was based on a faulty reading of the cardiac catheterization and an incomplete work-up of the Plaintiff.

Examining the facts in the light most favorable to the Plaintiffs, the court concludes that Dr. Magno is not entitled to summary judgment at this stage of the proceedings. Dr. Magno did not just refer Plaintiff to Dr. Dang, but affirmatively recommended that he undergo the surgery based on her assessment of his condition. The medical records, as Plaintiffs point out, reveal that she was the attending physician participating in the joint management of Plaintiff's care. On these facts, a jury could conclude that Dr. Magno retained sufficient control over the Plaintiff such that she owed him a duty to obtain informed consent. Further, there is a triable issue as to whether Dr. Magno did, in fact, obtain informed consent.

Additionally, Dr. Magno is not necessarily discharged from her duty by Dr. Dang's procurement of informed consent from Plaintiff. As discussed *infra* in section II.B., triable issues remain as to whether Dr. Dang properly obtained informed consent. If he did not, then Dr. Magno's duty may not be discharged (depending on the level of involvement the jury determines that she retained). Accordingly, summary judgment on this point must be DENIED.

### B. Claims Based on Negligence in Recommending the CABG Surgery

■ The crux of Plaintiffs' claims against Dr. Magno appear to be those that relate to her recommendation of the CABG surgery. Plaintiffs argue that Dr. Magno failed to consult Plaintiff's medical history or mainland physicians before coming to the conclusion that Plaintiff suffered from unstable angina. As a result, she was not aware that Plaintiff had been pre-

viously diagnosed with esophageal reflux and esophageal spasm. Plaintiffs contend that had Dr. Magno apprized herself of Plaintiff's medical history, she should have realized that Plaintiff was not suffering from unstable angina. Plaintiffs further claim that Dr. Magno's reading of the cardiac catheterization was incorrect, leading to the erroneous conclusion that Plaintiff suffered three-vessel coronary disease. Plaintiffs generally assert that Dr. Magno breached the standard of care in her treatment of Plaintiff.

Based on these mistaken diagnoses, Plaintiffs contend, Dr. Magno negligently recommended the CABG surgery. Plaintiffs have secured several experts who have opined that Dr. Magno's treatment of Plaintiff fell below the requisite standard of care, and that her treatment, diagnosis and recommendation were negligent. *See* Exhibit B attached to Plaintiffs' instant motion (expert reports from Drs. Thomas A. Preston, Arthur L. Golding, James M. Whitaker, and Thomas Benedict).

In her Motion for Summary Judgment, Dr. Magno asserts that CABG was the only suitable alternative for Plaintiff. She makes several arguments supporting this conclusion. But these are arguments that are properly made at trial; they cannot be disposed of in a summary judgment motion. Whether CABG surgery was the only appropriate course of action is a contested fact—both sides have experts supporting their own theories.[4] Plaintiffs claim that there were alternatives to surgery that Dr. Magno should have explored, including medical therapy and angioplasty. These are issues that must be resolved at trial.

In her reply to Plaintiffs' Opposition to the instant motion, Dr. Magno contends that Plaintiffs have failed to establish the necessary causal link between Dr. Magno's allegedly negligent recommendation and

---

**4.** In her motion, Dr. Magno also argues that she must prevail as a matter of law because the Plaintiffs had no experts to offer opinions on the appropriate standard of care, as required by Hawaii law. Since the filing of the motion, however, Plaintiffs have retained experts.

Plaintiff's injuries. She claims that they cannot show that "but for" Dr. Magno's actions, Plaintiff would not have suffered injury. This too is an argument for trial. Examining the experts' reports and drawing all inferences in favor of the non-moving party, the court finds that a reasonable jury could conclude that if not for Dr. Magno's allegedly negligent recommendation (based on an allegedly negligent diagnosis and work-up), Plaintiff would not have undergone the surgery, and therefore would not have suffered injury. Summary judgment on the claims of negligent treatment and negligent recommendation is DENIED.

### C. Plaintiffs' Punitive Damages Claims

■ Dr. Magno next argues that Plaintiffs are not entitled to punitive damages, as alleged in the Complaint. Under Hawaii law, plaintiffs must show by clear and convincing evidence that the defendant acted intentionally or wantonly; that she committed willful misconduct. Mere negligence is not sufficient to support an award of punitive damages. *See, e.g., Masaki v. General Motors Corp.,* 71 Haw. 1, 780 P.2d 566 (1989). In their opposition, Plaintiffs offer to dismiss their punitive damages claims without prejudice, apparently because discovery has not yet revealed support for the claim. Dr. Magno seeks dismissal with prejudice.

In *Celotex Corp. v. Catrett,* the United States Supreme Court explained the standards governing the award of summary judgment. 477 U.S. at 321, 106 S.Ct. 2548 (1986). The Court stated that:

> after adequate time for discovery and upon motion, [summary judgment shall be granted] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. 2548. In the instant case, there has been adequate time for discovery and Plaintiffs have failed to produce evidence supporting an award of punitive damages. Summary judgment on the issue of punitive damages is therefore GRANTED in favor of Dr. Magno.

### D. Plaintiff Lila Bynum's Claims for Loss of Consortium

' ■ Dr. Magno's final argument in support of her motion for summary judgment is that Lila Bynum is not entitled to damages for loss of consortium after she was divorced from Joseph Bynum. Plaintiffs respond that the Bynums only divorced because of financial concerns arising from Mr. Bynum's medical condition and that they remain a loving and committed couple. Thus, Plaintiffs argue that Lila Bynum should be entitled to damages based on loss of consortium from the time of the injury up to the present.

Courts throughout the country have uniformly held that damages stemming from loss of consortium are limited to the period during which the spouses were married, regardless of the reasons behind their divorce. *See e.g., Sexton v. United* States, 797 F.Supp. 1292, 1304–05 (E.D.N.C.1991); *Richardson v. Volkswagenwerk, A.G.,* 552 F.Supp. 73, 87 (W.D.Mo.1982); *In re Marriage of Plasencia,* 541 N.W.2d 923 (1995); *Planned Parenthood of Northwest Indiana v. Vines,* 543 N.E.2d 654 (Ind.Ct. App.1989); *Meizoso v. Bajoros,* 12 Conn. App. 516, 531 A.2d 943 (1987); *cf. Trombley v. Starr–Wood Cardiac Group, PC,* 3 P.3d 916, 922–23 (2000) (finding that husband not entitled to damages from loss of consortium where he and wife were only engaged at the time of the injury even though they were acting as husband and wife). Although Hawaii has not ruled on this point, the court concludes that the state Supreme Court would find in conformity with other jurisdictions around the country. Therefore, the court GRANTS Dr. Magno's motion for summary judgment on this point. Any recovery of damages for loss of consortium by Lila Bynum shall be limited to the duration of the Bynums' marriage.

### E. Disposition as to Defendant Dr. Magno

For the reasons stated above, the court GRANTS Dr. Magno's Motion for Summary Judgment with respect to: (1) Lila Bynum's claims based on lack of informed consent, (2) Plaintiffs' claims for punitive damages, and (3) Lila Bynum's claims for loss of consortium insofar as she seeks damages that accrued after the Bynums divorced.

The court finds triable issues, however, on the following points: (1) whether Dr. Magno was required to obtain informed consent for the CABG surgery and, if so, whether she properly obtained it, (2) whether Dr. Magno was negligent in recommending the CABG procedure and, and (3) whether her preliminary work-up of the Plaintiff was negligent, thus leading to the allegedly negligent recommendation. Accordingly, summary judgment on these claims is DENIED.

## II. Defendant Dr. Michael Dang's Motion for Summary Judgment

Defendant Dr. Dang ("Dr.Dang") is the surgeon who performed the CABG surgery on Plaintiff. He now seeks summary judgment on the grounds that: (1) Dr. Dang was not negligent during the surgery, (2) any such negligence was not the proximate cause of Plaintiff's condition, (3) he properly informed Plaintiff of the risks associated with the procedure (i.e., he obtained informed consent), (4) even if informed consent were not properly obtained, there is no issue as to causation because any reasonable person would have elected to undergo the surgery, and (5) there is no basis for an award of punitive damages. The Court will address each of Dr. Dang's arguments.

### A. Plaintiffs Cannot Prove Negligence and Proximate Cause

■ Dr. Dang's first argument is that Plaintiffs lack sufficient evidence to support their claim. To make a claim for negligence/medical malpractice, Plaintiffs must show (1) the duty and standard of care, (2) negligent breach of the standard of care, and (3) injuries proximately caused by the negligence. *See, e.g., Birmingham v. Fodor's Travel Publications* 73 Haw. 359, 833 P.2d 70, 74 (1992) (noting the elements of a negligence action); *Bernard v. Char,* 79 Hawai'i 371, 903 P.2d 676 (1996) ("*Bernard I*") *aff'd* 79 Hawai'i 362, 903 P.2d 667 (1996) ("*Bernard II*").

■ Dr. Dang submits that Plaintiffs cannot make out these elements. First, he argues that Plaintiffs have not presented expert evidence establishing the relevant standard of care. In medical malpractice cases, the standard of care must be established through expert testimony (unless it falls into a "common sense" exception). *See, e.g., Craft v. Peebles,* 78 Hawai'i 287, 893 P.2d 138, 149 (1995); *Bernard I,* 903 P.2d at 682.

■ Next, Dr. Dang argues that Plaintiffs cannot establish that Dr. Dang's acts were the proximate cause of Plaintiff's injuries because they have no expert testimony on this point either. Medical causation also must be proved by expert testimony in most circumstances. *See, e.g., Devine v. Queen's Medical Center,* 574 P.2d 1352 (1978).

■ In response, Plaintiffs allege that Dr. Dang was negligent in performing the surgery because surgery was not necessary—Dr. Dang improperly diagnosed Plaintiff and negligently failed to protect Plaintiff's phrenic nerve during surgery. To support their claims, Plaintiffs offer the expert reports of Drs. Preston, Golding and Whitaker (apparently obtained after Defendants' filing of their summary judgment motions). *See* Exhibit B (attached to Plaintiffs' Opposition to instant motion). These expert reports purport to establish the standard of care and also opine that the CABG surgery was the proximate cause of Plaintiff's current condition. *See, specifically,* Declaration of Dr. Golding (attached to Plaintiffs' Opposition as Exhibit B).

Although Dr. Dang challenges the credibility of Plaintiffs' experts and their opinions, credibility determinations are to be made at trial. Evaluating the reports of the Plaintiffs' experts and drawing all inferences in Plaintiffs' favor, the court finds that genuine issues of material fact remain for trial. Accordingly, Dr. Dang's Motion for Summary Judgment on this ground must be DENIED.

## B. Claims Based on Lack of Informed Consent

■ Dr. Dang claims that he is entitled to summary judgment on claims of lack of informed consent because it was his normal practice to properly inform patients. Moreover, Plaintiff signed the informed consent form and received additional information about the procedure from the nursing staff. Plaintiff's (Mr. Bynum's) deposition reveals that he has a very unclear recollection of the events on the day of surgery. Next, Dr. Dang argues that even if Plaintiff's informed consent was somehow defective, he is nevertheless entitled to summary judgment because any reasonable person in Plaintiff's position would have consented even if every risk and alternative was disclosed.

Plaintiffs respond that, despite signing the informed consent form, Plaintiff did not properly obtain informed consent. First, they claim Dr. Dang's behavior was improper because he sought Plaintiff's informed consent very shortly after Plaintiff had undergone the cardiac catheterization procedure. Moreover, they say, Dr. Dang spent only three minutes with Plaintiff before obtaining the informed consent. *See* Queen's Medical Records (attached to Plaintiffs' Opposition as Exhibit 1).

In addition, Plaintiffs argue that Dr. Dang did not provide them with relevant information about the risk to Plaintiff's phrenic nerve or about other forms of treatment short of surgery. While it is true that Plaintiff has a spotty memory of the day in question, Dr. Dang recognizes that he did not apprize Plaintiff of the availability of other alternatives and the risks associated with them (because he felt strongly that CABG surgery was the only real choice). Dr. Dang also did not discuss potential risks to the phrenic nerve, as stated in his deposition.

Finally, Dr. Dang failed to discuss with Plaintiff the findings of Dr. Callan, the consulting pulmonologist, who had opined that there might be post-operative complications. These omissions were breaches of the standard of care, according to Plaintiffs' expert Dr. Thomas A. Preston. *See* Declaration of Thomas A. Preston, M.D. (attached to Plaintiff's Opposition as Exhibit B).

■ With respect to Dr. Dang's claim that any reasonable person would have elected to undergo the surgery even if fully aware of all the risks and alternatives, Plaintiffs contend that this is an issue of fact to be decided by the jury. The standard governing informed consent in Hawaii is that of a "reasonable person"—would a reasonable person have consented to surgery had all the risks and alternatives been disclosed. *See, e.g., Bernard I*, 903 P.2d at 683;[5] *Bernard II*, 903 P.2d at 673–74. The court should not conclude as a matter of law, they argue, what a reasonable person would do had they been properly informed, that is for the jury to decide.

The court agrees with Plaintiffs. Based on their expert testimony, as well as the deposition of Dr. Dang (recognizing that he did not discuss alternatives with Plain-

---

**5.** *Bernard I* also explains what is necessary for informed consent:

Surgeons and other doctors are [ ] required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. Such a disclosure should include the nature of the pertinent ailment or condition, the risks of the proposed treatment or procedure, and the risks of any alternative methods of treatment, including the risks of failing to undergo any treatment at all.

903 P.2d at 683.

tiff), Plaintiffs have produced enough evidence to withstand a summary judgment motion. There are genuine issues of material fact as to whether informed consent was properly obtained.

As to whether the jury must determine whether a "reasonable person" would have undergone the surgery had informed consent been properly obtained, *Bernard II* is instructive. In *Bernard II*, the Hawaii Supreme Court affirmed that Hawaii uses an objective, reasonable person standard in evaluating whether lack of informed consent was the proximate cause of a plaintiff's injuries. 903 P.2d at 673. The Hawaii Supreme Court clearly contemplates that it should be the fact finder who determines "what a reasonable person with all of the characteristics of the plaintiff ... would have done under the same circumstances." *Id.* at 675 (*citing Fain v. Smith*, 479 So.2d 1150, 1155 (1985)). Accordingly, once Plaintiffs submit evidence that Dr. Dang failed to obtain informed consent, it is up to the fact finder to determine whether that failure was the proximate cause of Plaintiff's injuries. In other words, the fact finder must determine whether a "reasonable person" would have consented to the surgery even if informed consent had been proper. Summary judgment as to claims based on lack of informed consent, therefore, must be DENIED.

### C. Plaintiffs' Punitive Damages Claims

For the reasons discussed in section I.C. (discussing this issue with respect to Dr. Magno), the court GRANTS summary judgment to Dr. Dang on the issue of punitive damages.

### D. Disposition as to Defendant Dr. Dang

The court concludes that triable issues remain as to Plaintiffs' negligence and lack of informed consent claims, thus summary judgment is DENIED. However, the court GRANTS summary judgment in Dr. Dang's favor on the issue of punitive damages.

### III. Defendant Dr. John Callan's Motion for Summary Judgment

Defendant Dr. John Callan ("Dr.Callan") is a pulmonologist who evaluated Plaintiff at Queen's. Dr. Magno had requested a consultation from him prior to Plaintiff's surgery, but after Plaintiff had already signed the informed consent form provided by Dr. Dang. Dr. Callan moves for summary judgment on all claims against him on the grounds that (1) Plaintiffs cannot establish that Dr. Callan breached the applicable standard of care in a negligence claim, and (2) Dr. Callan was merely a consulting physician and thus owed no duty to Plaintiff to obtain his informed consent. The court now addresses each argument.

### A. Plaintiffs Cannot Establish that Dr. Callan Breached the Applicable Standard of Care (Medical Negligence Claim)

Dr. Callan's first claim is that Plaintiffs cannot establish any breach in the standard of care because they have no expert testimony to establish the standard. Since Dr. Callan filed his motion for summary judgment, however, Plaintiffs have procured expert declarations purporting to establish the standard. In his reply to Plaintiffs' Opposition to the instant motion, then, Dr. Callan argues that Plaintiffs cannot prevail on their medical negligence claim because they can produce no evidence as to causation. Specifically, he contends, they cannot show that "but for" Dr. Callan's allegedly negligent and substandard care, Plaintiff would not have suffered injury. In fact, Plaintiff already consented to surgery before Dr. Callan was even called in. Plaintiffs can show no causal link between Dr. Callan's behavior and Plaintiff's injuries, rather they only offer expert declarations as to the nature of Dr. Callan's care.

Plaintiffs, on the other hand, argue that Dr. Callan's evaluation of Plaintiff (Mr. Bynum) fell below the standard of care, as expressed by their experts. *See* Exhibit B (attached to Plaintiff's Opposition to instant motion). For example, Dr. Callan

allegedly failed to perform necessary tests, allegedly failed to consult Plaintiff's mainland doctors so he could adequately assess Plaintiff's condition, and allegedly failed to insure that Drs. Dang and Magno consider what findings he did make with respect to Plaintiff's condition (especially his finding that there was a "significant risk" of post-operative complications).

Plaintiffs have presented enough evidence to proceed to trial on the issue of negligence with respect to Dr. Callan. They have expert declarations which provide that his care of Plaintiff in the form of his consultation was not up to medical standards. An inference may be drawn that if Dr. Callan had performed properly and recommended against the surgery, Plaintiff would not have consented (or would have revoked his consent), and therefore would not have suffered injury. While it is true that the surgery was consented to before evaluation by Dr. Callan, a jury could draw the reasonable inference that surgery could have been avoided on a recommendation by him to Dr. Magno or Dang.

 Dr. Callan's contention that causation must be established through expert testimony (which he claims is lacking here) is only partly correct. Causation must be shown through expert testimony when causation is linked to a medical conclusion. For example, in *Devine v. Queen's Medical Center*, cited by Dr. Callan, the plaintiff was required to show by expert testimony that the negligent post-operative care of her husband resulted in his death. 59 Haw. 50, 574 P.2d 1352, 1353 (1978). A jury could not be expected to independently come to the medical conclusion that a certain kind of post-operative care would result in death.

In this case, however, Plaintiffs' experts have opined that the CABG surgery resulted in Plaintiff's injuries. They also have opined that Dr. Callan was negligent is his evaluation of Plaintiff and thus negligently signed off on the surgery. Here, if Plaintiffs can show that Dr. Callan acted negligently, the jury is permitted to draw

the reasonable inference that Dr. Callan's behavior caused (or contributed to) the surgery being performed—the surgery which, according to Plaintiffs' experts, caused the injuries. It does not take expert opinion for a jury to conclude that "but for" Dr. Callan's alleged negligence in evaluating Plaintiff, he would not have undergone the surgery. Accordingly, Dr. Callan's Motion for Summary Judgment based on Plaintiff's claims of general negligence is DENIED.

### B. Dr. Callan Was a "Consulting Physician" and thus Owed no Duty to Plaintiff to Obtain Informed Consent

 Dr. Callan's second argument is that because he was merely a "consulting physician," he owed no duty to the Plaintiff to obtain informed consent and is therefore entitled to summary judgment on any of Plaintiffs' claims against him based on lack of informed consent. Under Hawaii law, consulting physicians—those who make recommendations to the treating physician—generally are not required to obtain informed consent. *O'Neal*, 953 P.2d at 568 (distinguishing "consulting physicians," who are not required to obtain informed consent, from "treating," "referring," and "second opinion" physicians who may be so required).

Dr. Callan maintains that he was a consulting physician because he was called in by Dr. Magno to provide her with advice and recommendations on Plaintiff's treatment. He was acting at Dr. Magno's request and undertook no responsibility for the patient beyond providing input to Dr. Magno. In fact, Mr. Magno did not call Dr. Callan until after Plaintiff had already consented to surgery. Moreover, Dr. Callan does not meet the definition of a "treating," "referring," or "second opinion" physician in this case, and those types of physicians are the only ones with a duty to obtain informed consent.

Plaintiffs assert that Dr. Callan was part of Plaintiff's "medical/surgical" team (rather than a mere consultant) and therefore owed him a duty to obtain full informed

consent. They support this conclusion by pointing to language from Plaintiff's medical chart noting that Dr. Callan was being asked to assist in the "joint management" of Plaintiff's care. *See* Exhibits 1 and 2 (attached to Plaintiff's Opposition to the instant motion).

This court finds that Dr. Callan was a consultant to Dr. Magno. In *O'Neal,* the Hawaii Supreme Court held that a consulting physician owes no duty to a patient to obtain informed consent. 953 P.2d at 568. It further explained the role of a consulting physician:

> The primary duty of a consulting physician is to advise and make recommendations to the treating physician himself who may then, with full knowledge of the patient's history and other conditions, make the ultimate decision as to the information that should be given to the patient.

*Id.* (*citing Prooth v. Wallsh,* 105 Misc.2d 603, 432 N.Y.S.2d 663 (N.Y.Sup.Ct.1980)); *see also Fowerbaugh v. University Hospitals,* 118 Ohio App.3d 402, 692 N.E.2d 1091, 1094 (1997) (finding that consulting physicians have no absolute duty to communicate their findings to the patient directly). Dr. Magno stated in her deposition that she looked to Dr. Callan as a consultant, someone to give her advice on how best to proceed. *See* Magno Deposition at 90, 92 (attached to Dr. Callan's Motion for Summary Judgment as Exhibit A). The crucial decision to go ahead with the surgery had already been made at that point and Plaintiff had already signed the informed consent form. *See* Magno Deposition at 187.

Additionally, as Dr. Callan noted, he does not qualify as a treating, referring or second opinion physician, i.e., one who is required to obtain informed consent. He never treated the patient, other than to evaluate him at Dr. Magno's request. He was not a referring physician because he never made any referrals—the surgery was already scheduled with Dr. Dang before Plaintiff was seen by Dr. Callan. He was not a second opinion physician because he was not called and asked for advice directly by the plaintiffs. *See O'Neal,* 953 P.2d at 568 (defining a "second opinion physician" as one who "is called in directly by the patient to advise the patient, and not the referring doctor, about the proposed course of treatment or surgery.").

Plaintiffs do not offer serious evidence sufficient to create a genuine issue of material fact that Dr. Callan was other than a consulting physician. Their only evidence is the notation in Plaintiff's medical records by Dr. Magno that she consulted Dr. Callan to assist in the "joint management" of Plaintiff and the statement by Dr. Magno in her deposition that Dr. Callan was part of the "team." *See* Queen's Records (attached to Plaintiffs' Opposition as Exhibit 2); Magno Deposition at 152–54 (attached to Plaintiffs' Opposition as Exhibit 1). Plaintiffs present no evidence that Dr. Callan actually participated in the "joint management" of Plaintiff's case. Absent any evidence by the Plaintiffs that Dr. Callan in fact did something other than consult with Dr. Magno after evaluating the Plaintiff, Dr. Callan is entitled to summary judgment on this point. The single notation on a medical chart and the passing reference to the "team" are simply insufficient to raise Dr. Callan's level of participation to one who was required to obtain the Plaintiff's informed consent.[6]

Plaintiffs argue in the alternative that even if the court finds that Dr. Callan is a

---

**6.** It is necessary at this point for the court to articulate why Dr. Callan may be liable under a general negligence theory, but not under an informed consent theory. In *Prooth,* 105 Misc.2d 603, 432 N.Y.S.2d 663, relied on heavily by the Hawaii Supreme Court in *O'Neal,* 953 P.2d 561, the New York Supreme Court explained that each doctor involved in a particular case has a duty to perform his or her function with due care. *Prooth,* 432 N.Y.S.2d at 665; *see also Malki v. Krieger,* 213 A.D.2d 331, 624 N.Y.S.2d 167, 169 (N.Y.App. Div.1995) (finding that the duty of care of a consultant is to "advise and make appropriate recommendations to plaintiff's treating physician."). Numerous cases throughout the country have recognized a direct cause of action against a consultant for negligence

consulting physician (which it has), he nevertheless still had a duty to obtain informed consent. They contend that Dr. Callan "injected himself into the informed consent process by providing information directly to the Bynums." They rely on a case from the Eastern District of Pennsylvania, *Jones v. Philadelphia College of Osteopathic Medicine*, to support the argument that once a health care provider undertakes the obligation to provide informed consent, he/she/it must make certain that the informed consent is full and proper. 813 F.Supp. 1125, 1131 (E.D.Pa. 1993) (an informed consent case against a hospital).

Plaintiffs reliance on *Jones* is misplaced. There is no evidence that Dr. Callan undertook any obligation to obtain Plaintiff's informed consent. The fact that he spoke to the Bynums after his evaluation of Mr. Bynum does not automatically mean that he was attempting to "inject [ ] himself into the informed consent process." The only evidence Plaintiffs point to regarding Dr. Callan's conversation with the Bynums is from Dr. Callan's own deposition where he states that he told Plaintiff his assessment of Plaintiff's condition. *See* Callan Deposition (attached to Plaintiffs Opposition as Exhibit 3). Even if this court were to accept the *Jones* proposition,[7] Plaintiffs have not presented sufficient evidence that

stemming from their consultation. *See, e.g., Bradford v. Baystate Medical Center*, 415 Mass. 202, 613 N.E.2d 82 (1993); *Fernandez v. Admirand*, 108 Nev. 963, 843 P.2d 354 (1992); *Bonaparte v. Floyd*, 291 S.C. 427, 354 S.E.2d 40, 48 (1987).

As each doctor is required to perform with care, each doctor is likewise required to explain the risks and alternatives (i.e., obtain informed consent) associated with his her treatment. *Prooth*, 432 N.Y.S.2d at 665. Each doctor is not, however, required to obtain informed consent for every other phase of the treatment, absent some sort of retention of control over the patient's whole case. *Id.* It would not be reasonable to require every doctor at every stage of a patient's care to procure informed consent for treatment provided by other doctors at other stages. *Id.* at 666. While there is no Hawaii case directly on point, this court concludes that if presented with the question, the Hawaii courts would permit such a cause of action.

Applying these principals in the case of Dr. Callan, the court finds that he did have an obligation to exercise due care in his evaluation of Plaintiff and in his recommendations to the other doctors. Breach of this obligation could lead to liability for negligence. But as a consultant, he did not have any duty to Plaintiff to obtain informed consent for the CABG surgery. At most, Dr. Callan had a duty to explain any risks (if there were any) related to his evaluation of the Plaintiff. Dr. Callan, as a physician who evaluated but did not treat the Plaintiff, is entitled to rely on the treating cardiologist and surgeon to obtain Plaintiff's informed consent. He still may be liable, though, for his own alleged negligence resulting from the allegedly improper evaluation.

The court further notes that no one in this case alleges that Dr. Callan did not have a

duty to Plaintiff to perform properly in his role as a consultant in evaluating Plaintiff. There are a line of cases which hold that in some circumstances, where the consultant talks only with the treating physician, and never sees the patient, the consultant has no duty of care to the patient. *See, e.g., NBD Bank v. Barry*, 223 Mich.App. 370, 566 N.W.2d 47 (1997). The facts of this case indicate that Dr. Callan did not have such a limited role, and therefore he is bound by duty to the Plaintiff not to be negligent.

7. As stated above, *Jones* stands for the proposition that even where no duty to obtain informed consent exists, once a duty is voluntarily assumed, it must be performed right. *Jones* itself involved a case against a hospital. The court held that the hospital had no duty to obtain the informed consent of the patient (that was the job of the surgeon). Despite its lack of duty, however, the hospital nevertheless provided the patient with an informed consent form, bearing the hospital's name and logo and which purported to spell out the risks and alternatives related to the surgery. Once the hospital provided that detailed form (i.e., undertook to obtain informed consent), the court held that it had an obligation to make sure it was full and adequate. 813 F.Supp. art 1131. The instant case is distinguishable. In *Jones*, the hospital clearly undertook to obtain informed consent. In the instant case, Dr. Callan merely talked to the Plaintiffs. There is no evidence that he presented them with any forms or otherwise explicitly undertook to obtain informed consent for the CABG surgery. At most Dr. Callan's direct discussion with the Plaintiffs would go to his potential liability for an allegedly negligent consultation.

Dr. Callan injected himself into the informed consent process. Accordingly, summary judgment to Dr. Callan on the issue of informed consent is GRANTED.

### C. Disposition as to Dr. Callan

The court finds that Plaintiffs have come forth with enough evidence to create a jury question on the issue of Dr. Callan's negligence in evaluating the Plaintiff and in discussing his findings with Drs. Magno and Dang. Summary judgment, therefore, on the general issue of negligence is DENIED. On the issue of informed consent, however, the court finds that Dr. Callan was not required to provide informed consent because of his status as a "consulting physician" and because he did not gratuitously undertake to obtain informed consent. Accordingly, summary judgment on the issue of informed consent with respect to Dr. Callan is GRANTED.

### IV. Defendant Queen's Medical Center's Motion for Summary Judgment

Finally, Defendant Queen's Medical Center (QMC) also moves for summary judgment. It claims that (1) it did not employ the defendant doctors (rather they were independent contractors) and therefore was not responsible for their alleged negligence, (2) likewise, QMC was also not responsible for obtaining informed consent, (3) QMC had nothing to do with the surgery being performed, (4) in any case, Plaintiffs cannot establish the standard of care because they have produced no expert testimony on the subject, and (5) Plaintiffs cannot sustain a claim of punitive damages as alleged in the Complaint. The court now turns to QMC's arguments.

### A. QMC Does Not Employ Defendant Doctors and so it Cannot be Liable for Their Allegedly Negligent Acts

Drs. Magno, Dang and Callan have hospital privileges at QMC, but QMC is not their employer. They are independent

contractors that bill patients for services on their own, separate from the hospital bill.[8] QMC argues that because the doctors are independent contractors rather than employees, QMC bears no responsibility for their actions under a respondeat superior theory of liability. In support of this contention, QMC cites *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 497 P.2d 564 (1972), in which Justice Abe, in a concurring opinion, wrote:

> [w]ith the possible exception of one decision, courts have always held that a hospital is not liable for the negligent acts of the physicians who are not employed by the hospital. The ordinary physician is not the hospital's 'servant' because the hospital has no 'right to control' the acts of an 'independent contractor.'

*Id.* at 573–74.

Plaintiff, on the other hand, argues that QMC is liable on a theory of apparent or ostensible authority. Under this theory, QMC would be liable if QMC appeared to have authority over the defendant doctors, even if in actuality it did not.

█ QMC responds that Plaintiffs never alleged any claims based on apparent authority/vicarious liability (as opposed to respondeat superior) in the Complaint. Instead they made general allegations of negligence directed at all four Defendants and only brought up notions of vicarious liability in the response. Because the time for amending the Complaint has already passed, QMC contends that Plaintiffs cannot now be allowed to go forward with claims based on apparent authority/vicarious liability. Even if the court is inclined to examine the apparent authority/vicarious liability claims, QMC argues that it is still entitled to a grant of summary judgment because Plaintiffs have not established the elements necessary to prove apparent authority.

Addressing the procedural point first, QMC apparently anticipated such a claim

8. Plaintiffs admit in their Opposition that the doctors are independent contractors and not QMC employees.

by Plaintiffs, as its Motion for Summary Judgment discusses whether QMC might be liable for the acts of the defendant doctors. When QMC was named as a defendant in this case, it was put on notice that the claims to be asserted against it would probably derive from a theory of respondeat superior, vicarious or agency liability. Accordingly, the court will address the issue.

■ The court turns first to the question of whether QMC may be held liable for the allegedly negligent acts of the defendant doctors. It is undisputed that the defendant doctors here are independent contractors. The question thus becomes: under what circumstances may a hospital be liable for the allegedly negligent acts of its independent contractor doctors? Hawaii has not squarely addressed this question, though numerous other states have.

A recent slew of cases from around the country have held that although a hospital is generally not liable for the negligence of a physician who is an independent contractor, a hospital may be liable for a physician/independent contractor where he/she is cloaked in the apparent authority of the hospital, i.e., where the patient reasonably believes that the doctor is an agent of the hospital. *See, e.g., Espalin v. Children's Medical Center of Dallas,* 27 S.W.3d 675 (2000); *Butkiewicz v. Loyola Univ. Medical Center,* 311 Ill.App.3d 508, 244 Ill.Dec. 149, 724 N.E.2d 1037 (2000); *Simmons v. Tuomey Regional Medical Center,* 341 S.C. 32, 533 S.E.2d 312 (2000); *Guadagnoli v. Seaview Radiology,* 184 Misc.2d 961, 712 N.Y.S.2d 812 (2000); *Valdez v. Pasadena Healthcare Management,* 975 S.W.2d 43 (1998); *Kashishian v. Al–Bitar,* 194 Wis.2d 722, 535 N.W.2d 105 (1995); *Chapa v. St. Mary's Hospital of Saginaw,* 192 Mich.App. 29, 480 N.W.2d 590 (1991); *Menzie v. Windham Community Hospital,* 774 F.Supp. 91 (D.Conn.1991); *Jackson v. Power,* 743 P.2d 1376 (Alaska 1987). *See generally* 40A Am.Jur.2d *Hospitals and Asylums* § 47 (1999) (citing numerous ad-

ditional other cases). Apparent authority cases arise often, though not always, in Emergency Room settings.

The above courts differ, however, as to when the appearance of authority exists, with some courts adopting much more liberal standards than others. In Wisconsin and Illinois, for example, courts have held that where a patient could reasonably assume that a doctor was an employee of the hospital, even though no such express representation was made, a hospital may be liable under a theory of apparent authority. *Kashishian,* 535 N.W.2d at 108 (finding that patients are entitled to assume that unfamiliar doctors working at a hospital, especially in the ER, are employees rather than independent contractors); *Butkiewicz,* 724 N.E.2d at 1038 (finding that a hospital may be liable for the acts of a physician independent contractor unless patient knows or should know that physician is independent contractor regardless of whether physician is an ER doctor or another type); *see also Jackson,* 743 P.2d at 1382 (finding that, at least with respect to ER physicians, no express representation by the hospital is required, nor is testimony regarding reliance); *Simmons,* 533 S.E.2d at 322 (same).

In Texas and Connecticut, however, plaintiffs are required to make a stronger showing to hold hospitals liable under this theory. There, a plaintiff must affirmatively establish that (1) he/she had a reasonable belief that physician was agent/employee of the hospital, (2) the belief was generated by some affirmative act of the hospital or physician, and (3) the patient justifiably relied on the representation of authority. *Valdez,* 975 S.W.2d at 46–47 (granting summary judgment where plaintiff could not point to any action by the hospital in which it held out physician as its agent, even though physician was an ER doctor); *Menzie,* 774 F.Supp. at 97 (granting summary judgment where plaintiff could not establish that he relied on the apparent agency relationship between patient and doctor).[9] The tests for appar-

9. The facts in *Menzie* are very similar to the

facts at issue in this case. Plaintiff was ad-

ent agency or apparent authority do not turn on whether the events in question occurred in an Emergency Room setting. Where the patient was admitted to the Emergency Room, however, the elements for apparent agency are more likely to be met, whatever test is used.

After considering the voluminous case law on the subject, this court believes that Hawaii would adopt the test as set out by the Texas and Connecticut courts, *infra*. Plaintiffs must show that the hospital actually did something to imply authority, not just that it failed to inform patients of a lack of authority. Moreover, Plaintiffs must demonstrate that they somehow relied on the representations of authority. Allowing recovery based on apparent authority would conform Hawaii to the clear trend throughout the country.[10] Adopting the test set out above will preserve the general rule that hospitals are not generally liable for the acts of independent contractors because they lack the requisite control over them. To adopt a more liberal interpretation would be to allow the exception to swallow the rule.

The court now turns to applying the test to the facts at hand, and analyzes each of the elements. First, Plaintiffs have produced enough evidence to show a reasonable belief that the doctors were agents of the hospital. All the forms presented to the Plaintiffs bore the QMC name. The Plaintiff was unfamiliar with the doctors and had no reason to believe that they were not agents of the hospital. His only

encounters with them were at the hospital after he was air-lifted there—he never consulted with them outside it.

Second, it is at least arguable that QMC held itself out as the "employer" of the doctors, i.e., it took the required affirmative step, by its forms which bore its name and which do not appear to have disclaimed affiliation with the doctors.

Finally, the court finds that Plaintiffs have not put forth insufficient evidence that they relied on QMC's status as the "apparent employer," or that they looked to QMC rather than the individual doctors for care. *See Jackson,* 743 P.2d at 1380 (considering whether the patient looks to the institution or to the doctor in deciding whether apparent agency is present). The only evidence they have presented is that a nurse (a true employee of QMC) assured the Bynums that Dr. Dang was an excellent surgeon, thereby creating the impression that Dr. Dang was a hospital employee. By itself, this is insufficient to show that the Plaintiffs relied on QMC as the "employer" of the defendant doctors.

The court recognizes, however, that prior to this Order, the parties were unaware of the precise test the court would apply. The court, therefore, will defer ruling on this claim and permit the parties to present supplemental briefing and/or affidavits on the issue of reliance. Supplemental briefs must not exceed 15 pages and must be filed within 30 days of the issuance of this Order. After reviewing the parties'

---

mitted to the ER after a motorcycle accident. The ER doctor called the "on call" orthopedic surgeon (an independent contractor) who recommended immediate surgery. The orthopedic surgeon called the "on call" anesthesiologist (also an independent contractor). After suffering injury, the plaintiff sued the hospital based on the negligence of the orthopedic surgeon and the anesthesiologist on a theory of apparent authority.

The Connecticut court recognized the doctrine of apparent authority, but held that it did not apply to the facts at hand. The plaintiff had failed to present any evidence that he relied on any appearance of authority by the hospital.

10. This rule also comports with the opinion of this court in *Domingo v. Doe,* 985 F.Supp. 1241 (D.Hawai'i 1997). *Domingo* involved a claim against a hospital alleging that the hospital had negligently granted hospital privileges to a certain doctor who had a history of substance abuse. In finding that hospitals had a duty to exercise care in granting hospital privileges, this court held: "Hospitals have a responsibility to ensure the quality of the medical care at their facilities." *Id.* at 1245. Citing a case from the Supreme Court of Washington, the court went on to note that "[h]ospitals are also in a superior position to monitor and control physician performance." *Id.* (*citing Pedroza v. Bryant,* 101 Wash.2d 226, 677 P.2d 166, 169–70 (1984) (en banc)).

additional submissions, the court will issue a supplemental ruling.

## B. Obtaining Informed Consent is the Responsibility of the Physicians, Not the Hospital

QMC's next argument in its motion is that it had no duty to obtain Plaintiff's informed consent because that is the responsibility of the doctors. QMC cites various Hawaii authority to this effect. *See, e.g., Keomaka v. Zakaib,* 8 Haw.App. 518, 811 P.2d 478 (1991) (noting that the duty to obtain informed consent lies with physicians; however, this case involved only a defendant doctor and not a hospital); *O'Neal,* 87 Hawai'i 183, 953 P.2d 561 (same); *Domingo,* 985 F.Supp. at 1248 ("a hospital does not have an independent duty to obtain the informed consent of the physician's patients.")

Plaintiffs, however, urge this court to adopt the reasoning found in *Jones,* 813 F.Supp. 1125, and as discussed *supra* with respect to Dr. Callan. *See* section III.B., n. 7. *Jones* held that where a hospital gratuitously undertook to obtain a patient's informed consent (though it was not required to do so), the hospital assumed a duty to complete the informed consent process fully and adequately. They argue that because QMC provided the doctors with the consent forms (which bore QMC's name) and had an institutional policy regarding informed consent, it "injected itself in the consent process" thereby becoming subject to liability. They also argue that the hospital "injected itself" through the agents of its nurse, who apparently spoke highly of Dr. Dang and thus encouraged Plaintiff to go through with the surgery.

■ According to Hawaii law, physicians, and not hospitals, are required to obtain the informed consent of patients. *See Domingo,* 985 F.Supp. at 1248 (also citing cases from other jurisdictions); *see also Cedars Medical Center,* 738 So.2d at 366 (explaining reasoning behind this rule by noting that it is the physician and not the hospital who has the skill, training and experience to properly obtain informed consent). Hawaii has not addressed the issue, however, of whether an exception to this general rule applies when hospitals "inject themselves into the informed consent process." As explained earlier, *Jones* involved a claim against a hospital for lack of informed consent. That court found that where a hospital provided an informed consent form to a patient, which bore its name and logo and explained the risks associated with the patients's procedure, the hospital may be liable for the contents of that form, even though hospitals are generally not required to obtain informed consent. 813 F.Supp. at 1131; *accord Magana v. Elie,* 108 Ill.App.3d 1028, 64 Ill. Dec. 511, 439 N.E.2d 1319 (1982).

This court declines to decide whether Hawaii would adopt a rule similar to the one established by the Eastern District of Pennsylvania in *Jones,* because it finds that even if such a rule is applied, Plaintiffs cannot make out a claim under it. In a post-*Jones* case, the Eastern District of Pennsylvania granted a motion for summary judgment against a plaintiff who also alleged hospital liability based on the hospital's providing of an informed consent form. *Davis v. Hoffman,* 972 F.Supp. 308, 312 (E.D.Pa.1997). There, the court found that any deficiency in consent was not related to the form itself, but rather it was related to the way the form was filled in by the physician or to the way the physician explained the risks and alternatives. *Id.*

■ Similarly in this case, Plaintiffs have come forward with insufficient facts to support the contention that the form itself was flawed. They have not pointed to any authority, expert or otherwise, on what a consent form for CABG surgery should look like or how, specifically, this form was deficient (other than to note that it did not leave much blank space for doctors' comments). In fact, Plaintiffs are alleging that Mr. Bynum presented a special situation, that he did not fit the normal profile of someone who was to undergo CABG surgery. Their complaint lies with

the way the doctors handled the situation, not with the informed consent form itself.

■ Under these circumstances, the fact that the hospital provided a generic form, without more, is not enough to subject it to liability. To hold otherwise would be to completely abrogate the rule that hospitals are generally not responsible for obtaining informed consent. It is the physicians, with their skill and experience, who are the ones who should be responsible for obtaining informed consent. This responsibility should not be transferred to the hospital simply because it provides the forms to the doctors, absent some showing that the forms themselves provide inaccurate information. Doctors have the responsibility to supplement the forms where necessary. Furthermore, the fact that QMC had a policy relating to informed consent is similarly insufficient. Hospitals should be able to encourage independent contractor doctors to comply with the law of informed consent without becoming liable when the doctors do not comply. Accordingly, QMC's motion for summary judgment on the issue of informed consent is GRANTED.

### C. QMC's Conspiracy

■ In its Motion, QMC states that Plaintiffs have raised a claim alleging that QMC and the defendant physicians engaged in some kind of "conspiracy to perform unnecessary surgery for the financial gain of the hospital." *See* QMC's Motion for Summary Judgment at 9. In response to this claim, QMC argues that there is no evidentiary support, and, in fact, there is evidence to the contrary. Specifically, Drs. Dang and Magno both testified that *they*

recommended the surgery to Plaintiff, i.e., there is no evidence that the hospital itself was involved in the decision or recommendation.

In their Opposition, Plaintiffs appear to argue that summary judgment should not be granted on this point because they have not been able to complete discovery on the issue (and QMC is not cooperating). Their theory in support of this "conspiracy" argument is that QMC's marketing campaign advertises that "People come to Queen's for more heart procedures than any other medical facility in Hawaii. Each year, Queen's performs over 23,000 heart-related tests and 3,000 heart procedures, including over 525 open heart surgeries." [11] Apparently, Plaintiffs believe that QMC may have unnecessarily ordered Mr. Bynum's surgery in an effort to bolster their statistics for purposes of their advertising campaign.[12]

The court finds this allegation lacks merit. Plaintiffs have come forward with no evidence linking the surgery to any improper motive by QMC. Drs. Magno and Dang have testified that they recommended the surgery, with no implication that they were pressured into doing so by QMC. Plaintiffs cannot circumvent this lack of evidence by claiming that they just have not found any evidence yet. They have had ample time for discovery, and the information they seek (so far as the court is aware) has not been the subject of any motion to compel. Moreover, an advertisement such as the one at issue here, cannot lead to any reasonable inference that the hospital was operating with bad or improper motive. Finally, the Complaint

---

11. The advertisement goes on to state that "Studies show that hospitals performing the most cardiac procedures have a lower complication rate and a shorter length of stay. Queen's matches some of the best heart programs in America." *See* Plaintiff's Opposition at 18; Exhibit 7 attached to Declaration of Thomas Benedict.

12. In their motion, Plaintiffs say that "they suspect that the information regarding Queen's heart surgery advertising campaign

will lead to evidence of a targeted effort to promote procedures, such as the one performed on Joe Bynum, for the increased profitability of Queen's. Plaintiffs also suspect that the evidence that remains unproduced will show that Queen's physicians, Queen's staff and Queen's management, in a concerted effort, encourage surgical intervention in cardiac cases rather than medical management for purposes of financial gain." *See* Plaintiff's Opposition at 18.

did not allege any claim based on this theory and should not now be allowed to rely on it—the Complaint in no way put QMC on notice that it would be faced with such egregious allegations. Accordingly, summary judgment in favor of QMC on any theories relating to idea that QMC ordered or encouraged the surgery for financial gain is GRANTED.

### D. Negligence Attributable to QMC Itself

QMC next argues that Plaintiffs should not be entitled to recover based on any theory that the hospital itself (rather than the doctors) acted negligently because they have put forth insufficient evidence to make out such a claim. The Opposition does not directly address this issue.

The court finds the argument meritorious. The Plaintiffs have not alleged any specific acts of negligence attributable directly to the hospital (except, perhaps, with respect to the informed consent form, as discussed *infra*). Additionally, Plaintiffs' experts opine as to the level of care provided by the doctors, but do not speak to any issues of negligence relating to the hospital. Accordingly, QMC's motion for summary judgment on any claims that it acted negligently is GRANTED.

### E. Punitive Damages Claims

For the reasons discussed in section I.C. (discussing this issue with respect to Dr. Magno), the court GRANTS summary judgment to QMC on the issue of punitive damages.

### F. Disposition as to QMC

The court GRANTS summary judgment in favor of QMC on all grounds except Plaintiff's negligence claim based on a theory of apparent authority. On the claim of apparent authority, the court DEFERS ruling until the parties supply it with supplemental briefing on the issue of reliance.

### CONCLUSION

For the reasons stated above, the court GRANTS IN PART AND DENIES IN PART Defendants' Motions for Summary Judgment.

IT IS SO ORDERED.